**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fatemeh Tabatabaeifar, | No. CV-25-01238-PHX-GMS (MTM) |
| Petitioner, | **ORDER** |
| v. | |
| Kika Scott, et al., | |
| Respondents. | |

Pending before the Court is Petitioner Fatemeh Tabatabaeifar's Motion for Preliminary Injunction (Doc. 8). For the reasons below, the Motion is granted.

## BACKGROUND

Petitioner is a citizen of Iran. In February 2025, Petitioner arrived in the United States through the desert, was detained, and is being held at a U.S. Immigration and Customs Enforcement ("ICE") facility in Eloy, Arizona. (Doc. 8 at 3). While in custody, Petitioner made various requests for asylum to ICE and United States Citizenship and Immigration Services ("USCIS") officers in February and March of 2025. (*Id.*).

Rather than follow the procedure mandated by 8 U.S.C. § 1225(b) and 8 C.F.R. § 208.3 for the expedited removal of unauthorized aliens who claim asylum, in mid-March 2025, a USCIS asylum officer assessed Petitioner under the Convention Against Torture ("CAT"). (*Id.* at 4). On March 21, 2025, the USCIS officer determined, under the CAT, that Petitioner failed to establish that it was more likely than not that she would be tortured if she returned to Iran. (*Id.*). On April 4, 2025, upon learning about the negative CAT

assessment, Petitioner's attorney requested that Petitioner's case be referred to an immigration judge for review. (*Id*.). On April 8, 2025, an asylum officer notified Petitioner of her negative CAT assessment, and Petitioner again requested asylum and asked the asylum officer to refer her case to an immigration judge. (*Id.* at 4).

On April 11, 2025, Petitioner's attorney emailed Respondents and stated that the asylum officer who notified Petitioner of her CAT assessment results failed to notify Petitioner of her right to request review by an immigration judge and failed to provide Petitioner the Form I-869 to request review of the decision. (Doc. 8 at 4). On April 13, 2025, Respondents notified Petitioner's attorney that Petitioner was "processed under Expedited Removal – Section 212(f)"[1] and "received a negative CAT determination," and that Petitioner was not entitled to an immigration judge's review of that decision. (*Id*. at 5).

On April 14, 2025, Petitioner filed a Petition for Writ of Mandamus (Doc. 1) in this Court, raising four separate causes of action. In her Petition for Writ of Mandamus, Petitioner brings the following claims: (1) Failure of Respondents to send Petitioner's case to an immigration law judge for review in violation of 8 U.S.C. § 1225(b)(1) and 8 C.F.R. § 208.30; (2) Failure of Respondents to assess Petitioner for her asylum claim in violation of the same statute and corresponding regulation–8 U.S.C. § 1225(b)(1) and 8 C.F.R. § 208.30; (3) Violation of the Administrative Procedure Act; and (4) Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. (Doc. 1 at 9-13). On April 16, 2025, Petitioner filed a Motion for Temporary Restraining Order and Preliminary Injunction Pursuant to Federal Rule of Civil Procedure 65 (Doc. 8).

---

[1] Section 212(f) of the Immigration and Nationality Act ("INA") provides: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).

**DISCUSSION**

### I.    Jurisdiction

This Court has jurisdiction over Petitioner's Claims.  Federal district courts have original jurisdiction over cases, such as this one, that "arise under" federal law, including the Constitution.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

Respondents argue that 8 U.S.C. § 1252(a)(2)(A) strips this Court of jurisdiction in this case.  (Doc. 28 at 11).  8 U.S.C. § 1252(a)(2)(A) provides that "no court shall have jurisdiction to review" the following: (1) "any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to Section 1225(b)(1) of this title;" (2) "a decision by the Attorney General to invoke the provisions of [Section 1225(b)(1)];" (3) "the application of such section to individual aliens, including the determination made under Section 1225(b)(1)(B);" and (4) "procedures and policies adopted by the Attorney General to implement the provisions of Section 1225(b)(1)."  8 U.S.C. § 1252(a)(2)(A)(i-iv).

But § 1252(a)(2)(A) does not apply in this case.  As indicated by the asylum officer's notification to Petitioner on April 13,[2] and as counsel for the United States candidly acknowledged at oral argument on May 9,[3] Respondents do not purport to follow Section 1225(b) in this case, nor do they purport to remove Petitioner pursuant to Section 1225(b).  Rather, Respondents purport to directly repatriate Petitioner based on a new procedure that the government has fashioned, not under Section 1225(b), but under Presidential Proclamation No. 10888, "Guaranteeing the States Protection Against Invasion."  At oral argument on May 9, Counsel for the United States confirmed that the only reason that

---

[2] On April 13, 2025, Respondents notified Petitioner's attorney that Petitioner was "processed under Expedited Removal – Section 212(f), received a negative CAT determination."  (Doc. 8 at 5).

[3] At oral argument on May 9, 2025, the Court stated, "What we've got in the end is direct repatriation because the President has required it pursuant to his executive order. Is that correct?"  To which Counsel for the United States responded, "Yes, that's correct."  The Court then stated that such action "would not be pursuant to 1225(b)" and, instead, "is subject to a whole different procedure that results from the Presidential Proclamation." And Counsel for the United States responded that that was "correct."

1    Petitioner received a CAT assessment was Respondents' obligation under Convention

2    Against Torture, not Section 1225(b).  Since Petitioner was not subjected to any expedited

3    removal proceedings pursuant to Section 1225(b),[4] Section 1252(a)(2)(A) does not strip

4    the court of jurisdiction over Petitioner's claims.[5]

5        Respondents also argue, "the Court lacks jurisdiction under 8 U.S.C. § 1252(f)(1)

6    to grant any relief that would compel the government to operate multiple covered INA

7    provisions in a specific manner."  (Doc. 28 at 12).  Section 1252(f)(1) provides that "no

8    court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or

9    restrain the operation of [Sections 1221 to 1232 in the INA], other than with respect to the

10   application of such provisions to an individual alien against whom proceedings under such

11   part have been initiated."  8 U.S.C. § 1252(f)(1).  But the Court is not "enjoin[ing] or

12   restrain[ing] the operation of [Sections 1221 to 1232 in the INA]."  *See* 8 U.S.C. §

13   1252(f)(1).  As established above, the government is not subjecting Petitioner to any

14   process under the INA, but rather, a new procedure under the Presidential Proclamation.

15   Section 1252(f) does not bar an injunction on the operation of a provision that is not located

16   in Sections 1221 to 1232 in the INA.  *Gonzalez v. U.S. Immigr. and Customs Enf't*, 975

17

18   [4] The Ninth Circuit has held, pursuant to 8 U.S.C. § 1252(a)(2)(A), that "Congress has
     clearly and unambiguously precluded [the courts] from asserting jurisdiction over the
19   merits of individual expedited removal orders, even with regard to constitutional
     challenges to such orders."  *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1149 (9th Cir.
20   2022); *see also Lamare v. Garland*, 2023 WL 8666044, No. 20-71358, at *1 (9th Cir. Dec.
     15, 2023) ("Congress has stripped [the courts] of subject matter jurisdiction to review
21   expedited removal proceedings that involve aliens who . . . have not yet effected entry into
     the United States.").  In those Ninth Circuit cases, the petitioner was subjected to expedited
22   removal proceedings and expedited removal orders pursuant to Section 1225(b).  District
     courts in the Ninth Circuit have consistently held that the jurisdictional bar under Section
23   1252(a)(2)(A) applies to the expedited removal proceedings that are brought under Section
     1225(b).  *C.f. United States v. Avalos-Perez*, No. 3:16-CR-02827, 2017 WL 1400018, at
24   *3 (S.D. Cal. Apr. 19, 2017) ("As to a meaningful opportunity for judicial review, that too
     is foreclosed by expedited removal proceedings brought under 8 U.S.C. § 1225."); *United
25   States v. Arizmendi-Depaz*, No. 18-CR-4949, 2019 WL 3945459, at *2 (S.D. Cal. Aug. 21,
     2019) (holding "the INA precludes meaningful judicial review of the validity of the
26   proceedings that result in an expedited removal order under 8 U.S.C. § 1225").
     [5] The Supreme Court has confirmed that the jurisdictional bar under Section 1252(a)(2)(A)
27   is "aimed at protecting the Executive's discretion from the courts."  *Reno v. Am.-Arab Anti-
     Discrimination Comm.*, 525 U.S. 471, 486 (1999).  Here, the Court does not review any
28   discretionary decisions regarding Petitioner's removal because the decision whether to
     follow the statutorily mandated process delineated in Section 1225(b) is not discretionary.
     Judicial review of such decision, therefore, is not barred by Section 1252(a)(2)(A).

F.3d 788, 814 (9th Cir. 2020) (holding that "§ 1252(f)(1)'s limitations do not apply" where the relevant provision "is not located in [Sections 1221 to 1232 in the INA]").  Nor does Section 1252(f)(1) "prohibit an injunction simply because of collateral effects on a covered provision" in the INA.  *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 120 F.4th 606, 627 (9th Cir. 2024).  Therefore, Section 1252(f)(1) does not strip the court of jurisdiction to consider the operation of the Presidential Proclamation as to Petitioner.

As such, the Court has jurisdiction to hear Petitioner's claims.

## II.    Legal Standard for Injunctive Relief

"A party seeking injunctive relief under Rule 65 of the Federal Rules of Civil Procedure must show that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest."  *Patel-Hasmukhbhai v. Barr*, No. CV-20-01121, 2020 WL 13544980, at *2 (D. Ariz. June 8, 2020) (citing *Winter v. Nat. Res. Def. Couns., Inc.*, 555 U.S. 7, 20 (2008)).  Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  The movant must make "a certain threshold showing . . . on each factor."  *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).

## III.    Analysis

Petitioner seeks a preliminary injunction "enjoining and prohibiting [Respondents], their agents, employees, and assigns from executing or enforcing any order of removal or deportation of [Petitioner], and from taking any action to effectuate her removal from the United States, until such time as the Immigration Judge has issued a final decision on her case."  (Doc. 8 at 11).

### a.  Likelihood of Success

The Court first considers whether Petitioner is likely to succeed on the merits of her claims.  In her Petition for Writ of Mandamus, Petitioner brings the following claims: (1) Failure of Respondents to send Petitioner's case to an immigration law judge for review in

violation of 8 U.S.C. § 1225(b)(1) and 8 C.F.R. § 208.30; (2) Failure of Respondents to assess Petitioner for her asylum claim in violation of the same statute and corresponding regulation–8 U.S.C. § 1225(b)(1) and 8 C.F.R. § 208.30; (3) Violation of the Administrative Procedure Act; and (4) Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. (Doc. 1 at 9-13).

Mandamus is an extraordinary remedy and is available to compel a federal official to perform a duty only if: "(1) the individual's claim is clear and certain; (2) the official's duty is 'ministerial and so plainly prescribed as to be free from doubt;' and (3) no other adequate remedy is available." *Azurin v. Von Raab*, 803 F.2d 993, 995 (9th Cir. 1986) (quoting *Fallini v. Hodel*, 783 F.2d 1343, 1345 (9th Cir. 1986)).

Petitioner's first two claims, under 8 U.S.C. § 1225(b)(1) and 8 C.F.R. § 208.30, involve the alleged unlawful failure of Respondents to provide Petitioner with a credible fear determination and, if negative, refer Petitioner's asylum claim to an immigration judge for review. (Doc. 1 at 9-12). 8 U.S.C. § 1225(b)(1)(A)(i) provides that an immigration officer may remove without further hearing an alien who is "arriving in the United States" and found "inadmissible under Section 1182(a)(6)(C) or 1182(a)(7)" unless "the alien indicates . . . an intention to apply for asylum under Section 1158." "An asylum officer shall conduct interviews" of such aliens. 8 U.S.C. § 1225(b)(1)(B)(i). "If the officer determines at the time of the interview that an alien has a credible fear of persecution . . . the alien shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii).[6] If "the officer determines that an alien does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review" unless the alien requests "prompt review by an immigration judge" of the determination, in which case, such "review shall include an opportunity for the alien to be heard and questioned by an immigration judge either in person or by telephonic or video connection." 8 U.S.C. § 1225(b)(1)(B)(iii)(I-III). The immigration

---

[6] At oral argument on May 9, the government conceded that an assessment under the Convention Against Torture was not identical to the credible fear determination under the 8 U.S.C § 1225(b)(1), which evaluates additional factors, such as whether an alien will face persecution upon her return.

judge's review "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." 8 U.S.C. § 1225(b)(1)(B)(iii)(III). The corresponding regulation, 8 C.F.R. § 208.30, provides that an "asylum officer shall inquire whether the alien wishes to have an immigration judge review the negative [credible fear] decision, which shall include an opportunity for the alien to be heard and questioned by the immigration judge." C.F.R. § 208.30(g)(1). Petitioner argues that Respondents' "failure to conduct an interview to make a credible fear determination or to refer [Petitioner] to an immigration judge, despite her multiple requests, violates federal regulations under 8 C.F.R. § 208.30 and [federal statute under] 8 U.S.C. § 1225(b)(1)(B)(iii)(III)." (Doc. 8 at 6).

As to Petitioner's first two claims, Respondents argue that Petitioner cannot establish a likelihood of success because "the Presidential Proclamation bars these claims and was a valid exercise of the President's authority under 8 U.S.C. § 1182(f) and 1185(a) and Article II of the Constitution." (Doc. 28 at 9). Respondents are incorrect.

On January 20, 2025, President Donald Trump issued Proclamation 10888, "Guaranteeing the States Protection Against Invasion." In that Proclamation, the President declared that the entry of (1) "any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information" and (2) "aliens engaged in the invasion across the southern border" are "detrimental to the interests of the United States."[7] 90 Fed. Reg. at 8335. The President thus directed "that entry into the United States of such aliens be suspended." *Id.* In addition to suspending entry of such aliens, the President "restrict[ed] their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. § 1158," *id.*, which provides the right to claim asylum.

In doing so, the President purportedly invoked his authority under 8 U.S.C. §§

---

[7] The Proclamation does not distinguish between aliens who arrive at a port of entry seeking lawful entry into the United States and aliens who come into the United States intentionally evading inspection at a port of entry.

1182(f) and 1185(a).  Section 1182(f) of the INA provides: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).  The presidential power under Section 1185(a) "substantially overlaps" with § 1182(f). *Trump v. Hawaii*, 585 U.S. 667, n.1 (2018); *see also* 8 U.S.C. § 1185(a) ("Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.").  Congress has thus "delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances." *Hawaii*, 585 U.S. at 683.  "Lawful entry refers to an entry involving inspection and admission by an immigration officer." *Lezama-Garcia v. Holder*, 666 F.3d 518, 528 (9th Cir. 2011).  Where a person effects entry, the Supreme Court "has recognized additional rights and privileges not extended to those who are merely on the threshold of initial entry." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("Once an alien enters the country, the legal circumstance changes.").

Section 1182(f) "grants the President broad discretion to suspend entry of aliens into the United States." *Hawaii*, 585 U.S. at 683-84.  "The sole prerequisite to the President's exercise of this power is a finding that the entry of aliens 'would be detrimental to the interests of the United States.'" *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 760 (9th Cir. 2018) (quoting *Hawaii*, 585 U.S. at 685).

Although broad, the scope of the delegated power under Section 1182(f) "is not limitless." *Doe #1 v. Trump*, 957 F.3d 1050, 1066 (9th Cir. 2020).  For "the President may not override particular provisions of the INA through the power granted to him in § 1182(f)." *East Bay Sanctuary Covenant*, 932 F.3d at 760.  In *Trump v. Hawaii*, the Supreme Court held that Section 1182(f) "does not give the President authority to

countermand Congress's considered policy judgments" and "does not allow the President to expressly override particular provisions of the INA." 585 U.S. at 688-91 (upholding a presidential proclamation where "plaintiffs [did] not point to any contradiction with another provision of the INA" so "the President [had] not exceeded his authority under Section 1182(f)"); *see also Pacito v. Trump*, No. 2:25-cv-255, 2025 WL 655075, at *10 (W.D. Wash. Feb. 28, 2025) (holding that *Trump v. Hawaii* "establishes the principle that the President's invocation of Section 1182(f) becomes unlawful and ultra vires when it overrides or conflicts with the INA's statutory provisions").

Additionally, the President's power under § 1182(f) is limited to only the power to restrict entry into the United States. *See East Bay Sanctuary Covenant*, 932 F.3d at 773. Congress has authorized the President to "suspend . . . entry" and to "impose on the entry of aliens any restrictions he may deem appropriate." 8 U.S.C. § 1182(f). That express delegation of power to restrict entry makes clear that Congress did not delegate to the President any other power in § 1182(f). *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012) ("The enumeration of powers is also a limitation of powers, because the enumeration presupposes something not enumerated."); *see also City of Tulsa, Okl. V. Midland Valley R. Co.*, 168 F.2d 252, 254 (10th Cir. 1948) ("[T]he enumeration of specific powers operates to exclude those not enumerated."). Moreover, in delegating to the President the power to restrict the entry of aliens under Section 1182(f), "Congress did not delegate authority to eviscerate portions of the statute in which the Congressional delegation of power was made." *Nat'l Ass'n of Mfr. v. U.S. Dep't of Homeland Sec.*, 491 F.Supp.3d 549, 564 (N.D. Cal. 2020).

Along with specifying the terms of entry into the United States, the INA addresses a number of topics, including the terms on which any alien may request asylum. "Asylum is a concept distinct from admission,[8] which permits the executive branch—in its

---

[8] "The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas*, 533 U.S. at 693; *see also Leng May Ma*, 357 U.S. at 187 ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry."). "An alien 'comes to' the United States when the alien crosses the border into the United States regardless of whether he or

discretion—to provide protection to aliens who meet the international definition of refugees." *East Bay Sanctuary Covenant*, 932 F.3d at 757. "Our asylum law has its roots in the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("Convention"), and the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("Protocol") . . . Congress enacted the Refugee Act of 1980 . . . to bring the INA into conformity with the United State's obligations under the Convention and Protocol." *Id.*

Pursuant to Section 1158(a)(1) of the INA, Congress has provided: "Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). "By definition, asylum concerns those physically present in the United States." *East Bay Sanctuary Covenant*, 932 F.3d at 773. The Supreme Court has held that those physically present in the United States have "those rights regarding admission that Congress has provided by statute," including the right to claim asylum. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020).

In *East Bay Sanctuary Covenant v. Trump*, the Ninth Circuit confronted a proclamation that was purportedly issued under the President's § 1182(f) authority and

---

she is under official restraint." *U.S. v. Munoz*, 412 F.3d 1043, 1049 (9th Cir. 2005). Mere crossing the border or physical presence in the United States does not constitute entry. *See Thuraissigiam*, 591 U.S. at 114, 140 (2020) (holding that alien who "crossed the southern border without inspection or entry document" cannot be said to have "effected an entry"); *see also Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (holding that, despite nine years of physical presence in the United States, an alien "was still in theory of law at the boundary line and had gained no foothold in the United States"). And "although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1097 (9th Cir. 2004); *see also Leng May Ma*, 357 U.S. at 188 ("[T]he detention of an alien in custody pending determination of [their] admissibility does not legally constitute an entry though the alien is physically within the United States."). Because "[l]awful entry refers to an entry involving inspection and admission by an immigration officer." *Lezama-Garcia*, 666 F.3d at 528. Where a person effects entry, the Supreme Court "has recognized additional rights and privileges not extended to those who are merely on the threshold of initial entry." *Leng May Ma*, 357 U.S. at 187; *see also Zadvydas*, 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstance changes."). But a person who has crossed the border and is merely physically present in the United States "has only those rights regarding admission that Congress has provided by statute." *See Thuraissigiam*, 591 U.S. at 140.

that, in combination with a new regulation issued by the Attorney General, made "asylum unavailable to any alien who seeks refuge in the United States if she entered the country from Mexico outside a lawful port of entry." 932 F.3d at 755. The Ninth Circuit held that such action is not a valid "exercise of the President's authority under § 1182(f) because it does not concern the suspension of entry or otherwise 'impose on the entry of aliens . . . restrictions [the President] deem[s] to be appropriate.'" *Id.* at 773 (quoting 8 U.S.C. § 1182(f)).

Here, the Proclamation at issue suspends the entry of certain aliens based on a finding that the entry of such aliens would be "detrimental to the interests of the United States." 90 Fed. Reg. at 8335. But, in addition to suspending the entry of certain aliens, the Proclamation "restrict[s] their access to provisions of the INA that would permit their continued presence in the United States." *Id.* Thus, in addition to suspending the entry of certain aliens and, resultingly, suspending their access to the "additional rights and privileges" extended to those who effect entry, *see Leng May Ma*, 357 U.S. at 187, the Proclamation seeks to restrict their "rights regarding admission that Congress provided by statute" and that the Supreme Court held are available to anyone who crosses the border into the United States, whether or not through lawful entry. *See Thuraissigiam*, 591 U.S. at 140.

The Supreme Court has made clear that "the President may not override particular provisions of the INA through the power granted to him in § 1182(f)." *East Bay Sanctuary Covenant*, 932 F.3d at 760. By "restricting" certain aliens from accessing the "provisions of the INA . . . including, but not limited to [Section] 1158," 90 Fed. Reg. at 8335, the President, through the express terms of the Proclamation, unlawfully "override[s] particular provisions of the INA." *See Hawaii*, 585 U.S. at 689; *Nat'l Ass'n of Mfr.*, 491 F.Supp.3d at 566 (holding at the preliminary injunction stage "that the issuance of [a presidential proclamation pursuant to Section 1182(f)] is invalid based on the finding that it unlawfully eviscerates portions of the INA").

And, similar to the proclamation in *East Bay Sanctuary Covenant*, this

- 11 -

Proclamation's restriction on "access to provisions of the INA that would permit their continued presence in the United States," 90 Fed. Reg. at 8335, is not a valid "exercise of the President's authority under § 1182(f) because it does not concern the suspension of entry or otherwise 'impose on the entry of aliens . . . restrictions [the President] deem[s] to be appropriate.'" *See* 932 F.3d at 773 (quoting 8 U.S.C. § 1182(f)).  The plain language of Section 1182(f) does not mention or reference asylum, much less delegate any authority to restrict access to asylum, as provided by Congress in Section 1158(a)(1).  By granting the President broad power to restrict entry into the United States, Congress did not grant the President any power to restrict an alien's right to request asylum.  Because, in delegating to the President the power to restrict the entry of aliens under Section 1182(f), "Congress did not delegate authority to eviscerate portions of the statute in which the Congressional delegation of power was made." *Nat'l Ass'n of Mfr.*, 491 F.Supp.3d at 564.

Though never granted entry to the United States, Petitioner "is physically present in the United States." *See* 8 U.S.C. § 1158(a)(1).  Pursuant to Section 1158(a)(1), regardless of "whether or not [she arrived] at a designated port of arrival," and "irrespective of [her alien] status," Congress has provided that Petitioner "may apply for asylum in accordance with" Section 1158 and, where applicable, Section 1225(b).  *See id.*  Section 1225(b) applies to "applicants for admission," such as Petitioner, who are "present in the United States," but have "not been admitted."  8 U.S.C. § 1225(a)(1).  Section 1225(b) "provides that asylum seekers shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Rodriguez v. Robbins*, 804 F.3d 1060, 1081 (9th Cir. 2015) (quoting 8 U.S.C. § 1225(b)(1)(B)(iii)(IV)).  Since Petitioner is physically present in the United States, she has such "rights regarding admission that Congress has provided by statute." *See Thuraissigiam*, 591 U.S. at 105.  The "President may not override [those] particular provisions of the INA through the power granted to him in § 1182(f)." *See East Bay Sanctuary Covenant*, 932 F.3d at 760.  Petitioner, therefore, demonstrates a likelihood that the Presidential Proclamation is not a valid exercise of the President's statutory authority under Sections 1182(f) and 1185(a).

1    Nor is it likely that the Proclamation is a valid exercise of the President's
2    constitutional authority under Articles II and IV of the Constitution. "The exclusion of
3    aliens . . . is inherent in the executive power to control the foreign affairs of the nation."
4    *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). And "it is not the judicial
5    role . . . to probe and test the justifications of immigration policies." *Hawaii*, 585 U.S. at
6    704 (citations omitted). Courts "may nevertheless review the political branches' actions to
7    determine whether they exceed the constitutional or statutory scope of their authority." *See*
8    *East Bay Sanctuary Covenant*, 932 F.3d at 756. Although Article II grants the President
9    executive power, the legislative power and the power to "establish an uniform Rule of
10   Naturalization" belongs to Congress. *See* U.S. Const. art. I, § 8, cl. 4. "'The power of
11   executing the laws . . . does not include a power to revise clear statutory terms that turn out
12   not to work in practice.'" *East Bay Sanctuary Covenant*, 932 F.3d at 774 (quoting *Util.*
13   *Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014)). And when, as here, "the President
14   takes measures incompatible with the expressed or implied will of Congress, his power is
15   at its lowest ebb, for then he can rely only upon his own constitutional powers minus any
16   constitutional powers of Congress over the matter." *Youngstown Sheet & Tube Co. v.*
17   *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). "Courts can sustain exclusive
18   Presidential control in such a case only by disabling the Congress from acting upon the
19   subject." *Id.* at 637-38. It is thus likely that the Proclamation is not a valid exercise of the
20   President's authority under Article II of the Constitution.

21   It is also likely that the Proclamation is not a valid exercise of the President's
22   authority under Article IV, Section 4 of the Constitution. That section states, "The United
23   States shall guarantee to every State in this Union a Republican Form of Government, and
24   shall protect each of them against Invasion." U.S. Const. art. IV, § 4. The Proclamation
25   provides that, pursuant to the Invasion Clause, the President "determined that the current
26   situation at the southern border qualifies as an invasion," and therefore suspended the entry
27   of certain aliens "engaged in the invasion." 90 Fed. Reg. at 8334-35.

28   In *State of California v. United States*, the state of California asked the court to

1    determine that the United States had "violated its obligations to protect the State from

2    invasion and to guarantee it a republican form of government under the Invasion and

3    Guarantee Clauses of Article IV of the United States Constitution by failing to stop the

4    intrusion of illegal aliens across the State's borders." 104 F.3d 1086, 1090 (9th Cir. 1997).

5    The state of California asked the court to determine that the United States had been

6    "invaded" when neither the executive nor legislative branch had made such a

7    determination. *Id.* at 1091. The Ninth Circuit noted that "the issue of protection of the

8    States from invasion implicates foreign policy concerns which have been constitutionally

9    committed to the political branches." *Id.* at 1091. Because the protection sought by

10    California would have required the court "to determine that the United States ha[d] been

11    'invaded' when the political branches ha[d] made no such determination," the claim was

12    nonjusticiable. *Id.*

13        The present case, however, does not arise in the context of any state asserting that

14    the United States violated its guarantee to a republican form of government by failing to

15    protect against an invasion. Nor does this case arise in the absence of a determination of

16    an "invasion" by another political branch. Instead, this case arises in the context of a

17    private litigant asserting rights authorized by an act of Congress which the President seeks

18    to unilaterally cancel by claiming that an invasion has occurred under Article IV. Under

19    such circumstances, the judiciary may review whether the President's assumption of the

20    authority to cancel legislative rights is correct. *See East Bay Sanctuary Covenant,* 932 F.3d

21    at 773 (invalidating a presidential proclamation to the extent it nullified the right to apply

22    for asylum). As the Ninth Circuit recently observed in *East Bay Sanctuary Covenant*:

23        "[I]f there is a separation-of-powers concern here, it is between the President
24        and Congress, a boundary that we are sometimes called upon to enforce.
        (citations omitted). Here, the Executive has attempted an end-run around
25        Congress . . . The Proclamation attempts . . . [to do] indirectly what the
        Executive cannot do directly: amend the INA. Just as we may not, as we are
26        often reminded, 'legislate from the bench,' neither may the Executive
27        legislate from the Oval Office."

28    *East Bay Sanctuary Covenant,* 932 F.3d at 774. Nor is there any concern that, in this

context, the Court is unable to evaluate the authority claimed by the President through the Invasion Clause.  "While [construing the term 'invasion'] may be no light undertaking, it is a judicial one."  *J.G.G. v. Trump*, No. 25-766, 2025 WL 890401, at *10 (D.D.C. Mar. 24, 2025); *see also United States v. Texas*, 719 F.Supp.3d 640, at 680-85 (W.D. Texas 2024) (undertaking a textual and historical analysis to determine whether immigration constitutes an invasion as described in the U.S. Constitution).

Irrespective of entry, Petitioner requests an asylum claim because of the express authorization of Congress.  *See* 8. U.S.C. § 1158.  Because Congress has expressly authorized anyone physically present in the United States, including Petitioner, to make an asylum claim, it seems difficult to conclude that Petitioner is an "invader" under Article IV.  Moreover, courts, including the *State of California* court, agree that the Invasion Clause aims to protect a state from "foreign hostility" and "was not intended to be used as urged by California" to address an influx of unauthorized aliens.  *State of Cal.,* 104 F.3d at 1091; *see also Padavan v. U.S.*, 82 F.3d at 23, 28 ("In order for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government."); *see also Texas*, 719 F.Supp.3d at 685 ("In light of the Constitution's structure and contemporary use of 'invasion,' the original public meaning of the term would have referred to an exceptionally dangerous incursion of organized armed hostiles.").

Further, although the Executive retains considerable power with regard to immigration, there is a "constitutional commitment of the issue to [another] coordinate political department."  *See Baker v. Carr*, 369 U.S. 186, 217 (1962).  The Constitution entrusted exclusively to Congress the power to make immigration laws.  *See Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]he formulation of [immigration] policies is entrusted exclusively to Congress."); *see also East Bay Sanctuary Covenant*, 932 F.3d at 755 ("Congress is vested with the principal power to control the nation's borders. This power follows naturally from its powers to establish an uniform [R]ule of Naturalization.").  There

1    is no "textually demonstrable constitutional commitment" of the issue of immigration to

2    the executive branch.  *See Baker*, 369 U.S. at 217.  The only "constitutional commitment"

3    for the President to rely on to declare an invasion involves the Invasion Clause itself, which

4    states only that "[t]he United States shall . . . protect [every state] against Invasion."  U.S.

5    Const. art. IV, § 4.

6         In this case, it thus seems likely that the issue of whether the circumstances

7    constitute an invasion within the meaning of the Constitution is a justiciable issue, and it

8    also seems likely that the Proclamation is not a valid exercise of the President's authority

9    under Article IV.  The Proclamation, therefore, likely lacks any statutory or constitutional

10    authority and, resultingly, does not prevent Petitioner from pursuing a final determination

11    on her asylum claim.

12         So, as to Petitioner's first two claims, Petitioner provides evidence that she made

13    several requests for asylum, and she demanded a credible fear determination and sought an

14    immigration judge's review of her asylum claim, but Respondents have refused to provide

15    her with a credible fear determination and have refused to refer her case to an immigration

16    judge.  (Doc. 8 at 4-5).  Petitioner cites multiple exhibits to show that she requested an

17    immigration judge's review of her case pursuant to 8 C.F.R. § 208.30 and 8 U.S.C. §

18    1225(b)(1)(B)(iii)(III).  (Doc. 1 at 8).  Petitioner argues that Respondents' "failure to

19    conduct an interview to make a credible fear determination or to refer [Petitioner] to an

20    immigration judge, despite her multiple requests, violates federal regulations under 8

21    C.F.R. § 208.30 and [federal statute under] 8 U.S.C. § 1225(b)(1)(B)(iii)(III)."  (*Id.* at 6).

22         8 C.F.R. § 208.30 provides that:

23

24         "If an alien is found not to have a credible fear of persecution
          or torture, the asylum officer shall provide the alien with a
25         written notice of decision and issue the alien a record of the
          credible fear determination, including copies of the asylum
26         officer's notes, the summary of the material facts, and other
          materials upon which the determination was based. The asylum
27         officer shall inquire whether the alien wishes to have an
          immigration judge review the negative decision, which shall

28

1

> include an opportunity for the alien to be heard and questioned
> by the immigration judge."

8 U.S.C. § 1225(b)(1)(B)(iii)(III) provides that:

> "The Attorney General shall provide by regulation and upon
> the alien's request for prompt review by an immigration judge
> of a determination under subclause (I) that the alien does not
> have a credible fear of persecution. Such review shall include
> an opportunity for the alien to be heard and questioned by the
> immigration judge, either in person or by telephonic or video
> connection."

Given the unambiguous language of 8 C.F.R. § 208.30 and 8 U.S.C.
§ 1225(b)(1)(B)(iii)(III) and the evidence reflecting Petitioner's unambiguous requests for
referral for a credible fear determination, Petitioner has demonstrated her "claim is clear
and certain." *See Azurin*, 803 F.2d at 995. Under 8 C.F.R. § 208.30 and 8 U.S.C.
§ 1225(b)(1)(B)(iii)(III), Respondent's "duty is ministerial and so plainly prescribed as to
be free from doubt." *See id.* Aside from referring Petitioner's case to an immigration judge
for review, "no other adequate remedy is available," *see id.*, as counsel for United States
has stated during oral argument on April 30, 2025, that no additional procedural steps need
occur before Petitioner's deportation.

Therefore, Petitioner has demonstrated a likelihood of success on the merits for her
first two claims. Since Petitioner has demonstrated a likelihood of success on the merits
for her first two claims, the Court need not consider Petitioner's third and fourth claims in
this Motion.[9]

### b. Irreparable Harm

The Court next considers whether Petitioner is likely to suffer irreparable harm in
the absence of injunctive relief. Petitioner has sufficiently established that she is likely to

---

[9] To the extent, however, that Petitioner brings a constitutional due process claim in Count IV, Petitioner seems unlikely to succeed on the merits in light of the caselaw regarding whether arriving aliens have constitutional rights. *See Thuraissigiam*, 591 U.S. at 138 (rejecting the notion that an arriving alien has a "constitutional right to expedited removal proceedings that conformed to the dictates of due process."). "As an arriving immigrant caught at the border, [Petitioner] has no constitutional rights regarding [her] application' for asylum." *See Mendoza-Linares*, 51 F.4th at 1148.

suffer irreparable harm in the absence of injunctive relief because "her removal could occur at any time, rendering her legal claims moot and placing her in immediate danger." (Doc. 8 at 8). "[A] noncitizen must show that there is a reason specific to his or her case . . . that removal would inflict irreparable harm—for example, that removal would effectively prevent her from pursuing her petition for review." *Leiva-Perez*, 640 F.3d at 969. In communications between Petitioner's attorney and Respondents, ICE Deportation Officer Shawn Napolitano wrote that Petitioner was "being processed as an Expedited Removal under INA 212(f)," (Doc. 1-4 at 4), indicating Respondents' intent to remove Petitioner from the United States, possibly before this Court can review her petition. If Respondents were to deport Petitioner, Petitioner would no longer be able to pursue the adjudication of her asylum claim, which "would effectively prevent her from pursuing her petition for review." *See Leiva-Perez*, 640 F.3d at 969. Indeed, at the oral argument on April 30, counsel for the United States asserted that Petitioner's deportation may proceed at any time as no additional procedural steps need occur. As Petitioner has shown that Respondents may deport her imminently, and her deportation would prevent her from pursuing her asylum claim, Petitioner has sufficiently shown a likelihood of irreparable harm. *See Patel-Hasmukhbhai v. Barr*, No. CV-20-01121, 2020 WL 13544980, at *3 (D. Ariz. June 8, 2020) ("Because removal would deprive Petitioner of the relief she seeks—asylum in the United States—she has shown that it is probable that she would suffer irreparable harm absent a stay."); *see also Ali v. Ashcroft*, No. C02-2304P, 2002 WL 35650203, at *1 (W.D. Wash. Nov. 14, 2002) ("Petitioners face an immediate risk of irreparable harm, as Respondents have told Petitioners that they are to be removed to Somalia imminently.").

### c. Balance of Equities and Public Interest

The Court next considers whether the balance of equities tips in Petitioner's favor and whether injunctive relief is in the public interest. These "third and fourth factors . . . merge . . . where the government is the opposing party." *Leiva-Perez*, 640 F.3d at 970. Courts "consider the public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," but also consider

the "public interest in prompt execution of removal orders, which may be heightened in certain circumstances, such as those involving particularly dangerous noncitizens." *Id.* (citing *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001)). The Court must consider whether the public interest favors the petitioner. *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992).

As discussed above, in the absence of a preliminary injunction, Petitioner risks removal from the United States to a country in which Petitioner asserts that she is likely to be tortured or otherwise persecuted. (*See* Doc. 8 at 8-9). There is no evidence in the record that suggests Petitioner poses a threat to the public. Further, "the public has a strong interest in ensuring that the nation's immigration laws are robustly—and fairly— enforced." *Inland Empire—Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018). Thus, the equities tip in Petitioner's favor and injunctive relief is in the public's interest.

### d. Bond

Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A district court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Here, considering the limited scope of the injunction, Respondents face no realistic harm from the Court enjoining Petitioner's removal prior to a complete assessment of Petitioner's asylum claim in accordance with the law. As such, no bond is necessary in this case.

### e. Conclusion

At this stage of the proceedings, Petitioner has demonstrated that she has a likelihood of success on the merits for her mandamus claims, irreparable harm is probable absent a preliminary injunction, the balance of hardships tips in her favor, and injunctive

- 19 -

relief is in the public's interest.  Accordingly, Petitioner's Motion for a Preliminary Injunction (Doc. 8) is granted as to Petitioner's request for a preliminary injunction "enjoining and prohibiting [Respondents], their agents, employees, and assigns from executing or enforcing any order of removal or deportation of [Petitioner], and from taking any action to effectuate her removal from the United States, until such time as the Immigration Judge has issued a final decision on her case." (Doc. 8 at 11).

In Petitioner's Reply, Petitioner requests for the first time a nationwide injunction "to enjoin the application of January 20, 2025 Proclamation 10888 for individuals who are present in the United States territory seeking asylum." (Doc. 33 at 27).  A nationwide injunction can be appropriate in the immigration law context.  *See East Bay Sanctuary Covenant*, 932 F.3d at 779 ("In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis.").  Since Petitioner raised her request for a nationwide injunction for the first time in her Reply and Respondents have not had an opportunity to brief the issue, however, the Court does not rule on Petitioner's request for a nationwide injunction at this time.  Petitioner may renew her request for a nationwide injunction in a subsequent motion and allow Respondents an opportunity to brief the issue, and only in that event would the Court decide whether to grant a broader injunction.

**IT IS THEREFORE ORDERED** that Petitioner's Motion for a Preliminary Injunction (Doc. 8) is **GRANTED**.

**IT IS FURTHER ORDERED** Respondents, their agents and assigns are enjoined from removing Petitioner from the United States prior to a complete assessment of her asylum claim, including a credible fear determination and an immigration judge's review, in accordance with 8 C.F.R. § 208.30 and 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

Dated this 14th day of May, 2025.

G. Murray Snow
Senior United States District Judge

- 20 -