John Nicolas Albukerk
Albukerk & Associates
1111 Westgate St.
Oak Park, IL 60301
Illinois State Bar No. 6218232
E-mail: nick.albukerk@gmail.com
Tel: (773)847-2600

Attorney of Plaintiff for Fatemeh Tabatabaeifar

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| FATEMEH TABATABAEIFAR, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> KIKA SCOTT, et al., ) <br> ) <br> Respondents. ) <br> ) | <br><br><br><br><br>Case No.: <br>CV−25−01238−PHX−MTL (MTM) <br><br>Hon. Judge: Michael T. Liburdi |

**Petitioner's Motion for a Nationwide Temporary Restraining Order and Request for a Nationwide Injunction**

NOW COMES Plaintiff Fatemeh Tabatabaeifar ("Petitioner"), by and through her counsel, John Nicolas Albukerk, *pro hac vice*, and respectfully moves this Court for the issuance of a nationwide temporary restraining order and nationwide injunction enjoining the enforcement of Presidential Proclamation 10888, issued on January 20, 2025. This injunction is sought for all individuals present within the territory of the United States who are eligible to seek asylum, regardless of whether their entry into the country was lawful. Petitioner requests that the injunction be applied retroactively to the date of the proclamation's issuance. In addition, Petitioner seeks an order requiring the return of individuals who were removed from the United States pursuant to the proclamation without being afforded proper asylum hearings, so that their claims may be adjudicated consistent with existing law and requirements of due process.

In support of this motion, Petitioner states as follows:

1

1. On April 16, 2025, Petitioner filed a Motion for a temporary restraining order and preliminary injunction pursuant to FRCP 65, challenging the legality of Proclamation 10888 and related implementing policies.
2. On May 14, 2025, this Court granted Petitioner's Motion for a Preliminary Injunction, enjoining Respondents from removing Petitioner without a full credible fear determination and immigration judge review, but reserved ruling on Petitioner's request for a nationwide injunction at the time.
3. Petitioner now renews her request for broader relief to prevent the continued enforcement of an unlawful proclamation that affects similarly situated asylum seekers across the United States.
4. As detailed below, a temporary restraining order and nationwide injunction are necessary to ensure uniform enforcement of immigration law, prevent irreparable harm to vulnerable individuals, and uphold the public interest.

## Statement of Law

5. Petitioner brings this action pursuant to Rule 65 of the Federal Rules of Civil Procedure, which governs the issuance of temporary restraining orders (TROs) and preliminary injunctions.
6. To obtain a nationwide injunction, a party must meet the same general requirements applicable to any injunction under federal law and demonstrate justification for such breadth. "A party seeking injunctive relief must show that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Nken v. Holder*, 556 U.S. 418, 435 (2009); Fed. R. Civ. P. 65. Where the federal government is the opposing party, the third and fourth factors merge. *Id.* Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer,* 680 F.3d 1068, 1072 (9th Cir. 2012). The movant must make "a certain threshold showing . . . on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).

7. The Ninth Circuit has emphasized that it has upheld nationwide injunctions where such breadth was necessary to remedy a plaintiff's harm. *See Cf. City and County of San Francisco v. Trump*, 897 F.3d 1244 (9th Cir. 2018). As the Fifth Circuit explained, nationwide injunctions are particularly appropriate in the immigration context because "immigration laws of the United States should be enforced vigorously and uniformly." 809 F.3d at 187–88; *see* U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power ... [t]o establish a *uniform* Rule of Naturalization....") (emphasis added).

8. This circuit established that the general rule regarding the scope of preliminary injunctive relief is that it "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *See L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (internal citation omitted); *see also Bresgal v. Brock*, 843 F.2d 1170,1171 (9th Cir.1987) ("An injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled.").

9. In the immigration context, the Ninth Circuit has also affirmed the principle of ensuring uniformity in immigration policy. *See Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017). The Fifth Circuit explained that "such a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington*, 847 F.3d at 1166–67 (*Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015). *See East Bay Sanctuary Covenant*, 932 F.3d at 774 ("In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis."). *See also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ("Where necessary to provide complete relief or ensure uniform application of federal law, courts may issue nationwide injunctions.").

10. The Ninth Circuit has also emphasized the appropriateness of broad relief. In *Washington v. Trump*, 847 F.3d 1151,1158 (9th Cir. 2017), the court upheld a nationwide injunction against Executive Order 13769, citing the need for uniformity in immigration enforcement and to avoid fragmented legal regimes.

11. Various courts have held that a proclamation issued under 8 U.S.C. § 1182(f) cannot override asylum protections mandated by statute. *See Hawaii, 585 U.S. at 689 ("We may*

*assume that* § 1182(f) does not allow the President to expressly override particular provisions of the INA")*; see also Nat'l Ass'n of Mfr.*, 491 F.Supp.3d at 566 (holding at the preliminary injunction stage "that the issuance of [a presidential proclamation pursuant to Section 1182(f)] is invalid based on the finding that it unlawfully eviscerates portions of the INA").

12. The nationwide scope of the immigration system and its centralized enforcement structures mean that a limited injunction may create confused and uneven enforcement of asylum procedures.

13. Courts have thus recognized that where federal policy affects individuals throughout the country, limiting an injunction to a single plaintiff or geographic region may be impracticable or unjust. See, e.g., *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 855–56 (9th Cir. 2020) (affirming preliminary injunction against asylum transit bar and finding nationwide relief appropriate).

<u>Argument</u>

14. In its May 14, 2025, Order (Doc. 37), this Court concluded that all four factors from *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), were satisfied. These factors continue to support injunctive relief on a broader, nationwide basis.

**A. Likelihood of Success on the Merits**

15. The Court already found that Petitioner demonstrated a likelihood of success on her claims, that Respondents violated her statutory and constitutional rights by enforcing Proclamation 10888. Specifically, the Proclamation unlawfully circumvented 8 U.S.C. § 1225(b)(1)(B), which guarantees that individuals expressing a fear of return to their home country are entitled to a credible fear interview, and, if found to have a credible fear, to an asylum hearing before an immigration judge. The implementing regulations further require that these procedures be provided without exception. See 8 C.F.R. § 208.30.

16. The Proclamation, which categorically bars individuals physically present in the United States from seeking asylum if they fail to meet novel criteria not authorized by statute, stands in direct conflict with these provisions. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987) (holding that the INA mandates individualized determinations in asylum

4

claims). The Proclamation unlawfully infringes on the statutory right to seek asylum under 8 U.S.C. § 1158(a)(1), which states that any individual who is physically present in the United States, regardless of status or manner of entry, may apply for asylum.

17. Further, as this Court noted in its last Order, the Supreme Court has held that § 1182(f) "does not give the President authority to countermand Congress's considered policy judgments" and "does not allow the President to expressly override particular provisions of the INA." Trump v. Hawaii, 585 U.S. at 688-91. Individuals present in the United States have "those rights regarding admission that Congress has provided by statute," including the right to claim asylum. See Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 140 (2020).

18. As this Court has already held, Petitioner successfully demonstrated a likelihood of success on the merits of her first two claims: (1) Failure of Respondents to send Petitioner's case to an immigration judge for review in violation of 8 U.S.C § 1225(b)(1) and 8 C.F.R. § 208.30; and (2) Failure of Respondents to assess Petitioner for her asylum claim in violation of the same statute and corresponding regulation, 8 U.S.C § 1225(b)(1) and 8 C.F.R. § 208.30.

19. Like Petitioner, thousands of similarly situated individuals are being stripped of their statutory right to apply for asylum in the United States, and instead Respondents continue to arbitrarily enforce a proclamation that lacks any statutory or constitutional authority, as this Court has said, which strips individuals present in the United States of their statutory right, and is in direct conflict with the INA.

20. This Court has also already established that Petitioner has demonstrated her "claim is clear and certain." See Azurin, 803 F.2d at 995. Under 8 C.F.R. § 208.30 and 8 U.S.C. § 1225(b)(1)(B)(iii)(III). Respondent's "duty is ministerial and so plainly prescribed as to be free from doubt." See id. Aside from referring Petitioner's case to an immigration judge for review, "no other adequate remedy is available," see id., as counsel for United States stated during oral argument on April 30, 2025, that no additional procedural steps need to occur before Petitioner's deportation.

21. If aliens throughout the United States are being stripped of their right to have their asylum application reviewed by an immigration judge, they too have demonstrated a claim that is clear and certain.

22. A nationwide injunction is appropriate in this context to ensure all individuals in the United States, regardless of how they entered or where they entered are treated under the same accordance with the law and its mandated procedures for asylum.

**B. Irreparable Harm**

23. As this Court has held, Petitioner faces the imminent risk of removal without access to mandatory asylum procedures. The same holds true for thousands of other asylum seekers across the country who are subjected to Proclamation 10888. Removal under such circumstances constitutes irreparable harm, especially where there is a risk of persecution or torture. *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (*per curiam*). Once removed, there is no practical way to undo the harm—particularly if individuals are returned to countries where they may face serious danger or persecution.

24. Absent an injunction, Petitioner and similarly situated individuals will face immediate removal without the opportunity to apply for asylum as permitted by law. The resulting risk of persecution or torture constitutes irreparable harm. See *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (*en banc*).

25. Courts routinely recognize that the deprivation of statutory rights and potential removal to life-threatening conditions constitutes non-compensable, irreparable injury.

26. Also discussed in this Court's prior Order (Doc. 37), ICE Deportation Officer Shawn Napolitano wrote that Petitioner was "being processed as an Expedited Removal under INA 212(f)," (Doc. 1-4 at 4), indicating Respondents' intent to remove Petitioner from the United States, possibly before this Court can review her petition. If Respondents were to deport Petitioner, Petitioner would no longer be able to pursue the adjudication of her asylum claim, which "would effectively prevent her from pursuing her petition for review" See *Leiva-Perez*, 640 F.3d at 969.

27. Further, this Court found that as Respondents may deport her imminently, and her deportation would prevent her from pursuing her asylum claim, Petitioner has sufficiently shown a likelihood of irreparable harm. See *Patel-Hasmukhbhai v. Barr,* No. CV-20-01121, 2020 WL 13544980, at *3 (D. Ariz. June 8, 2020) ("Because removal would deprive Petitioner of the relief she seeks—asylum in the United States—she has shown that it is probable that she would suffer irreparable harm absent a stay."); *see also Ali v.*

*Ashcroft*, No. C02-2304P, 2002 WL 35650203, at *1 (W.D. Wash. Nov. 14, 2002) ("Petitioners face an immediate risk of irreparable harm, as Respondents have told Petitioners that they are to be removed to Somalia imminently.").

28. Like Petitioner in this case, thousands of asylum seekers across the United States face irreparable harm through expedited removal procedures under INA 212(f) and would no longer be able to pursue the adjudication of their asylum claims. Because the Proclamation deprives asylum seekers within the United States from pursuing the relief they seek, there is a sufficient likelihood of irreparable harm.

**C. Balance of Equities and Public Interest**

29. As this Court has already ruled, the equities tip in Petitioner's favor and injunctive relief is in the public's interest. The government does not suffer harm from adhering to the law and permitting asylum applications to proceed under established statutory and procedural rules. In contrast, Petitioner and those similarly situated' liberty, safety, and statutory rights are at stake. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

30. As reported across various news and media outlets, President Trump's administration has been deporting asylum seekers across the United States without affording them meaningful access to the legal protections guaranteed under the Immigration and Nationality Act.

31. Recent reporting underscores the widespread fear and confusion caused by aggressive immigration enforcement tactics that disrupt community trust in the legal system. ICE arrests at courthouses—places where individuals seek justice—have surged, leaving immigrants frightened to appear for their scheduled hearings or to access critical legal resources. *See* Diego Torres, *Immigration Arrests at Courthouses Surge — Leaving People Confused, Angry and Afraid*, NBC News (May 7, 2025), https://www.nbcnews.com/news/latino/immigrations-arrests-ice-deportations-courthouse-legal-process-ice-rcna209671; Michael Balsamo & Rebecca Santana, *ICE Arrests Migrants at Courthouses, Sending Them Straight into Deportation*, AP News (June 4, 2025), https://apnews.com/article/immigration-court-arrests-ice-deportation-99d822cdc93ae7dc26026c27895d5ea1. These tactics erode the fundamental fairness of the immigration process and undermine public confidence in the rule of law.

32. Human rights organizations have also documented the dire consequences of the current policies on asylum seekers, revealing failures to respect the right to seek asylum and exposing individuals to expulsion without meaningful adjudication. *See The Right to Seek Asylum Does Not Exist at U.S.–Mexico Border*, Amnesty Int'l (Feb. 20, 2025), https://www.amnesty.org/en/latest/news/2025/02/the-right-to-seek-asylum-does-not-exist-at-u-s-mexico-border/; *"Nobody Cared, Nobody Listened": The U.S. Expulsion of Third-Country Nationals to Panama*, Human Rights Watch (Apr. 24, 2025), https://www.hrw.org/report/2025/04/24/nobody-cared-nobody-listened/us-expulsion-third-country-nationals-panama.

33. Moreover, credible reports expose serious mistreatment and mass deportations that have disproportionately affected vulnerable populations, including individuals with no criminal history and detainees subjected to abusive conditions. *See* Sergio Martínez-Beltrán, *Venezuelan Men Allege Mistreatment While in Detention in Guantánamo Bay*, NPR (Feb. 25, 2025), https://www.npr.org/2025/02/25/nx-s1-5306433/guantanamo-detainee-speaks-venezuela-trump-immigration-abuse; Eric Cortellessa & Brian Bennett, *Inside Donald Trump's Mass-Deportation Operation*, TIME (May 29, 2025), https://time.com/7291757/trump-deportation-ice-el-salvador/; Gianfranco Beran, *Migrants in U.S. Legally and With No Criminal History Caught Up in Trump Crackdown*, PBS NewsHour (Mar. 31, 2025), https://www.pbs.org/newshour/show/migrants-in-u-s-legally-and-with-no-criminal-history-caught-up-in-trump-crackdown.

34. These deportations are not isolated incidents—they reflect a systemic policy that results in asylum seekers being deported without individualized screenings, access to counsel, or an opportunity to have their claims heard by an immigration judge. *See* N'dea Yancey-Bragg, *Iranian Christians Seeking Asylum in US Deported to Panama, Unable to Return Home*, USA Today (Feb. 20, 2025), https://www.usatoday.com/story/news/politics/2025/02/20/iranian-christians-asylum-seekers-deported-panama/79217451007/; Joel Rose, *Asylum Seekers Deported by the U.S. Are Stuck in Panama, Unable to Return Home*, NPR (May 5, 2025), https://www.npr.org/2025/05/05/nx-s1-5369572/asylum-seekers-deported-by-the-u-s-are-stuck-in-panama-unable-to-return-home; *Unlawful Deportations of Asylum Seekers to*

*Panama, Costa Rica and Elsewhere Must Stop*, Human Rights First (Feb. 20, 2025), https://humanrightsfirst.org/library/unlawful-deportations-of-asylum-seekers-to-panama-costa-rica-and-elsewhere-must-stop/.

35. These practices leave individuals stranded in dangerous conditions, often without the ability to return home or seek protection from persecution elsewhere. The resulting harm is severe and irreparable, and it implicates not just the Petitioner, but a broader class of vulnerable individuals whose statutory and human rights are being disregarded. The public has a strong interest in ensuring that the government complies with the rule of law and does not carry out deportations in violation of due process and refugee protections.

36. The equities weigh heavily in favor or protecting statutory asylum rights. In the present matter, the government's interest in efficient immigration enforcement does not outweigh asylum applicants' fundamental right to due process and protection from torture. The balance of harms tips in favor of the Petitioner and the thousands of other eligible asylum seekers within the United States. Without the protection of a nationwide injunction, other individuals seeking asylum in the United States face irreparable harm in the form of torture, persecution, or death in their home country.

37. Respondents would suffer minimal or no harm from a nationwide injunction. Granting this kind of relief supports preserving the status quo for asylum procedures throughout the United States, and ensures that rights under the INA, CAT, and United States Constitution are fully and fairly adjudicated by an Immigration Judge. Finally, as expressed in this Court's last Order (Doc. 37), "the public has a strong interest in ensuring that the nation's immigration laws are robustly—and fairly—enforced." *Inland Empire—Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018).

38. The equities tip in Petitioner's favor, along with all the individuals present within the United States who were eligible to seek asylum upon ratification of the proclamation, so nationwide injunctive relief is in the public's interest.

**Nationwide Scope is Necessary**

30. Without a nationwide injunction, individuals in different jurisdictions will be subjected to radically different procedures depending solely on where and by whom they are apprehended—despite being equally entitled to asylum protections. Such inconsistency undermines the uniform application of immigration law that Congress intended. Moreover, Respondents' enforcement of Proclamation 10888 is not limited to any region or border actor. The Department of Homeland Security and Customs and Border Patrol apply the Proclamation nationwide, targeting individuals already present in the United States. An injunction limited to petitioner would have no practical effect in deterring its continued unlawful use elsewhere. The INA is not intended to be enforced arbitrarily based on district boundaries, and selective application of federal asylum procedures would violate the equal protection and due process principles embodied in immigration jurisprudence.

31. As the Ninth Circuit has stated, "[t]he need for uniformity in immigration policy is particularly strong" because immigration decisions affect foreign relations and national policy. *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), vacated as moot, 138 S. Ct. 377 (2017). Allowing the Proclamation to remain in effect would risk balkanizing immigration enforcement—a result clearly contrary to Congress's intent. *See Arizona v. United States*, 567 U.S. 387, 408 (2012) (emphasizing the federal government's exclusive authority over immigration policy and need for uniform enforcement).

32. As this Court explained in its Order, May 14, 2025 (Doc. 37), the Proclamation at issue suspends the entry of certain aliens based on a finding that the entry of such aliens would be "detrimental to the interests of the United States." 90 Fed. Reg. at 8335. But, in addition to suspending the entry of certain aliens, the Proclamation "restrict[s] their "rights regarding admission that Congress provided by statute" and that the Supreme Court held are available to anyone who crosses the border into the United States, whether or not through lawful entry. *See Thuraissigiam*, 591 U.S. at 140.

33. The President may not override particular provisions of the INA through the power granted to him in § 1182(f). *See East Bay Sanctuary Covenant*, 932 F.3d at 760; *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020). By "restricting" certain aliens from accessing the "provisions of the INA . . . including, but not limited to

[Section] 1158." 90 Fed. Reg. at 8335, the President, through the express terms of the Proclamation, unlawfully overrides particular provisions of the INA." *See Hawaii*, 585 U.S. at 689; *Nat'l Ass'n of Mfr.*, 491 F.Supp.3d at 566 (holding at the preliminary injunction stage "that the issuance of [a presidential proclamation pursuant to Section 1182(f)] is invalid based on the finding that it unlawfully eviscerates portions of the INA").

34. Though not granted entry to the United States, asylum seekers aside from Petitioner are "physically present in the United States." *See* 8 U.S.C. § 1158(a)(1). Pursuant to Section 1158(a)(1), regardless of "whether or not [she arrived] at a designated port of arrival," and "irrespective of [her alien] status," Congress has provided that Petitioner "may apply for asylum in accordance with" Section 1158 and, where applicable, Section 1225(b). *See id*. Section 1225(b) applies to "applicants for admission," such as Petitioner, who are "present in the United States," but have "not been admitted." 8 U.S.C. § 1225(a)(1).

35. Section 1225(b) "provides that asylum seekers shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Rodriguez v. Robbins*, 804 F.3d 1060, 1081 (9th Cir. 2015) (quoting 8 U.S.C. § 1225(b)(1)(B)(iii)(IV)).

36. Like Petitioner, thousands of individuals are being stripped of their right to apply for asylum, and as they are physically present in the United States, they have such "rights regarding admission that Congress has provided by statute." *See Thuraissigiam*, 591 U.S. at 105. The "President may not override [those] particular provisions of the INA through the power granted to him in § 1182(f)." *See East Bay Sanctuary Covenant*, 932 F.3d at 760.

37. By enacting Proclamation 10888, the President has restricted provisions of the INA that permit asylum seekers' continued presence in the United States. These individuals are often placed in expedited removal procedures, like Petitioner, and are not being afforded the statutory or procedural safeguards required under immigration law. This is an abrogation of due process rights and will result in the unjust rejection of many asylum claims. This Court has already stated that the Proclamation is likely not a valid exercise of the President's statutory authority under 1182(f) and 1185(a), nor valid constitutional authority under Articles II and IV of the Constitution. In this circumstance, only a

nationwide injunction can effectively remedy the group of plaintiffs harmed by Proclamation 10888 as it directly conflicts with the INA's statutory rights for asylum seekers.

38. Individuals who are being detained subject to expedited removal but claim fear of persecution or express an intention to apply for asylum should still receive a credible fear interview before an asylum officer and should also have the chance to have that decision reviewed by an immigration judge. Proclamation 10888 has expanded expedited removal while hindering the opportunity to apply for asylum, in direct conflict with the INA's statutory provisions, as well as humanitarian and international law.

39. Lastly, although Plaintiff did not expressly request a nationwide injunction in her initial complaint, the Ninth Circuit has held that courts may grant such relief when necessary to ensure complete relief or uniform application of federal law. In *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2917), the court affirmed a nationwide injunction despite the absence of a specific request, reasoning that uniform enforcement of immigration law required broad relief. Likewise, in *East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020), the court upheld nationwide relief to prevent inconsistent immigration policies across jurisdictions. These cases evince that courts retain equitable discretion to fashion appropriate relief regardless of the form of relief initially pleaded. Accordingly, the absence of a specific request in the initial complaint does not preclude this Court from ordering nationwide relief where warranted by the record and the interests of justice.

### Retroactive Application is Necessary to Ensure Complete Relief

40. The Ninth Circuit has affirmed the propriety of retroactive injunctive relief in immigration enforcement contexts where such relief is necessary to remedy ongoing or past constitutional violations. In *Gonzalez v. U.S. Immigration and Customs Enforcement*, 975 F.3d 788 (9th Cir. 2020), the court upheld a nationwide injunction that prohibited ICE from issuing detainers without probable cause based on flawed databases. Although the injunction was prospective in operation, the court emphasized the district court's equitable authority to craft relief broad enough to redress systemic constitutional deprivations, including harms already incurred.

41. Similarly, in *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017), the Ninth Circuit affirmed a preliminary injunction requiring the government to provide individualized bond hearings for detained immigrants who had previously been denied them. The court acknowledged that injunctive relief may be retroactive in effect when required to correct prior constitutional violations and restore due process guarantees.

42. In light of these precedents, retroactive application of the injunction sought here is both necessary and appropriate. Presidential Proclamation 10888 unlawfully stripped asylum seekers of meaningful access to adjudication procedures guaranteed by statute and constitutional due process. Individuals who applied for asylum after the Proclamation's issuance were denied hearings or removed under truncated procedures that failed to comport with statutory requirements.

43. To prevent irreparable harm and ensure these individuals are treated in accordance with due process, the Court should order that any injunction granted apply retroactively to the date the Proclamation took effect. This ensures that applicants harmed during the intervening period are not left without remedy.

    Due Process Requires the Return of Improperly Removed Asylum Seekers

44. This Court should order the return of those unlawfully deported without proper asylum hearings. Recently, in *D.V.D. v. U.S. Dep't of Homeland Sec.*, --- F. Supp. 3d ---, 2025 WL 1142968 (D. Mass. Apr. 18, 2025), the district judge ordered the government to facilitate the return of a Guatemalan man (referred to as O.C.G.) who had been deported under procedures implemented pursuant to Presidential Proclamation 10888. Despite articulating a credible fear of persecution and a history of severe abuse in Mexico, O.C.G. was removed without the opportunity to present his asylum claim. The court concluded that the removal likely lacked any semblance of due process and determined that effective relief required the government to return him to the United States so his asylum application could be properly adjudicated.

45. This precedent confirms that federal courts have both the authority and obligation to order the return of deported individuals where due process violations have tainted the removal process. The same constitutional concerns present in *D.V.D.* are evident here. Asylum seekers who were subjected to summary removals under Proclamation 10888

13

were denied meaningful opportunities to present their claims, often without notice, counsel, or a fair hearing.

46. Additionally, in *Trump v. J.G.G.*, 604 U.S. ___, 145 S. Ct. 1003 (2025), the Supreme Court addressed the removal of Venezuelan nationals detained under a presidential proclamation invoking the Alien Enemies Act (AEA). The district court initially issued temporary restraining orders to halt removals and subsequently ordered that several individuals who had already been deported without notice or the opportunity to seek judicial review be returned to the United States. *See J.G.G. v. Trump*, --- F. Supp. 3d ----, 2025 WL 1119481 (D.D.C. Apr. 16, 2025).

47. This district court ruling emphasized that removal without due process, particularly without an opportunity to seek habeas relief, was unconstitutional and warranted equitable relief, including return.

48. On review, the Supreme Court affirmed the principle that individuals subject to removal under the AEA are constitutionally entitled to meaningful notice and an opportunity to challenge their removal before it occurs. *See Trump*, 145 S. Ct. at 1003. The Court underscored that notice must be afforded within a reasonable time and in such a manner as will allow them to seek relief in the proper venue before such removal occurs and reiterated that due process protections apply even in expedited or national security-framed removal proceedings. *Id.*

49. This case offers a clear framework for the relief sought here. As in *J.G.G.*, individuals subject to Presidential Proclamation 10888 were denied a meaningful opportunity to have their claims for relief heard prior to their deportation. Many of these asylum seekers were removed summarily, without notice, access to counsel, or the ability to file for asylum protection as guaranteed under the INA.

50. Just as the district court in *J.G.G.* recognized that equitable relief, including return, was necessary to remedy constitutional violations resulting from unlawful removal, this Court has the authority, and indeed the obligation, to do the same.

51. Ordering the return of individuals who were deported under an unlawful and procedurally deficient implementation of the Proclamation is both a just and necessary remedy to restore access to the statutory and constitutional protections they were denied. Such an

order would uphold the integrity of our asylum system and ensure that due process remains a meaningful safeguard.

52. Accordingly, Petitioner respectfully requests that this Court, consistent with its equitable powers and the reasoning in *D.V.D.* and *J.G.G.*, order the return of those individuals who were unlawfully deported during the application of the Proclamation, so that their asylum claims may be lawfully and fairly heard.

### Conclusion

For the reasons set forth above, and in light of this Court's findings in its prior Order, Petitioner respectfully renews her request for a nationwide injunction enjoining Respondents and their agents from enforcing Presidential Proclamation 10888 against any noncitizen physically present in the United States seeking asylum, regardless of their manner of entry. Such scope is necessary to prevent irreparable harm, ensure the uniform application of immigration law, and safeguard the statutory and constitutional rights of asylum seekers throughout the country.

This relief would require the government to refrain from applying the Proclamation to bar individuals from seeking asylum solely because they did not enter at a designated port of entry and would ensure that all such individuals are provided with the procedural protections guaranteed by the INA —including a full credible fear interview and review by an immigration judge if requested.

A nationwide injunction is necessary to prevent irreparable harm to thousands of asylum seekers who would otherwise be categorically denied protection and subject to immediate removal in violation of federal law, ensure uniform application of immigration law across all jurisdictions, and restore compliance with the INA, which expressly allows all noncitizens physically present in the United States—regardless of status or manner of entry—to apply for asylum. Such an injunction can help to restore access to the asylum process that Congress provided for, and ensure claims for protection are evaluated lawfully and fairly on the merits. Accordingly, Petitioner respectfully asks this Court to grant the following relief:

(a) Grant a temporary restraining order and nationwide injunction pursuant to Federal Rule of Civil Procedure 65 to enjoin the enforcement of Presidential Proclamation 10888, issued on January 20, 2025, as applied to individuals present within the territory of the

United States seeking asylum, whether or not such individuals entered the United States lawfully.

(b) Issue an injunction with retroactive effect to the date of the Proclamation's issuance, January 20, 2025, thereby safeguarding the rights of all affected individuals by being able to use the proper procedural mechanisms as required under 8 U.S.C § 1225(b)(1) and 8 C.F.R. § 208.30.

(c) Issue an order refraining Respondents from applying the Proclamation to categorically deny asylum to individuals based solely on their failure to enter at a designated port of entry.

(d) Order the return of individuals who were deported without proper asylum hearings under the Proclamation, ensuring that they are granted the opportunity to have their asylum claims fairly and lawfully adjudicated.

**Dated: June 12, 2025**

Respectfully submitted,

Albukerk & Associates

_____

S/John Nicolas Albukerk

1111 Westgate St,
Oak Park, IL 60301
Tel: (773)847-2600