TIMOTHY COURCHAINE
United States Attorney
District of Arizona
THEO NICKERSON
Assistant U.S. Attorney

BRETT A. SHUMATE
Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
BRIAN C. WARD
Acting Assistant Director
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

*Attorneys for the Respondents*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Fatemeh Tabatabaeifar,<br><br>Petitioner,<br><br>v.<br><br>Kika Scott, et al.,<br><br>Respondents. | No. 2:25-cv-01238-PHX-GMS (MTM)<br><br>**OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**INTRODUCTION**

The nationwide injunction that Petitioner Tabatabaeifar seeks here would be a grave abuse of discretion to grant. Indeed, her request fails on multiple independent bases, including three different jurisdictional obstacles.

To start, this case is moot. Petitioner's mandamus petition sought only to compel the government to give *her* a credible fear interview to assess her asylum claim with the opportunity for immigration-judge review of any negative credible fear determination. Two weeks before she filed the instant motion, Petitioner received the credible fear interview she requested and was referred to an immigration judge for removal proceedings under 8 U.S.C. § 1229a. She has thus now received that complete relief and there is no more relief that this Court can afford *her*. Indeed, the entirety of relief sought by the instant motion would be awarded *purely to other individuals* not before this Court, which violates both Article III and principles of equity preclude. Tabatabaeifar does not even attempt to argue that the nationwide injunction she now seeks would remedy any injury *to her*.

But even if Tabatabaeifar's claims were not moot, the broad injunction she now seeks of the application of Presidential Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, to individuals present in the United States should not issue. Such class-wide relief where no class has been certified violates equitable and constitutional principles. In addition, insofar is Tabatabaeifar seeks a nationwide injunction with respect to how the government operates expedited removals—including how it implements the challenged Proclamation in those expedited proceedings—such relief is doubly barred. First because such challenges can only be brought in D.D.C. (as other plaintiffs have done) under 8 U.S.C. § 1252(e)(3). Second, § 1252(f) precludes injunctive relief to non-parties with respect to expedited removals. This Court is thus without jurisdiction to grant Petitioner's requested nationwide injunction with respect to expedited removals.

The injunctive-relief factors also weigh heavily against the requested nationwide relief. The Proclamation has been successful at reducing the number aliens illegally

crossing the Southern border—which had amounted to 8 million over the past four years. The Proclamation's continued enforcement is crucial to maintain operational control over the border.

Petitioner's arguments also fail on the merits. Petitioner's contention that Proclamation conflicts with the asylum and expedited removal statutes is incorrect. Congress has bestowed the President with authority to suspend the entry of any aliens—including aliens who may intend to seek asylum. The authority to suspend entry would be meaningless if it did not encompass the ability to also quickly expel aliens who evade it by crossing the border illegally. Indeed, just as the Executive may suspend access to asylum in order to effectuate a ban on introductions under Title 42, *see Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 729 (D.C. Cir. 2022), it may similarly suspend asylum claims to effectuate an entry bar under 8 U.S.C. § 1182(f).

This Court's previously expressed concern that the Executive is somehow attempting to evade review of the legality of the Proclamation is also misplaced. The Proclamation's application to aliens who violate its entry ban is already subject to a putative class action and programmatic challenge pending in D.D.C., which has been fully briefed and argued. *See Refugee and Immigrant Ctr. for Educ. and Legal Servs. (RAICES) v. Noem*, No. 1:25-cv-00306 (D.D.C. filed Feb. 3, 2025). That is where Congress directed that suits challenging expedited removal procedures be brought under 8 U.S.C. § 1252(e)(3), and that is where the Executive has not been remotely shy about vigorously defending the legality of the Proclamation. By addressing individual cases like this one in a manner that is favorable to the claimant, the government is facilitating careful review by that court of a weighty decision that is critical to border security. This Court should not step in to disrupt that balance but should allow these issues to be addressed in the case that has been comprehensively briefed. Further, the merits of any challenge to the Proclamation are ultimately not presented here where the Court is triply without jurisdiction to grant the instant request for a nationwide injunction due to (1) mootness, (2) § 1252(e)(3), and (3) §

- 2 -

1252(f). Because of that lack of jurisdiction, "the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted).

## BACKGROUND

The Proclamation. On January 20, 2025, President Trump issued Proclamation 10888, *Guaranteeing the States Protection Against Invasion* ("The Proclamation"). Ex. 1, 90 Fed. Reg. 8333 (Jan. 29, 2025). The President noted that Congress has created a comprehensive scheme in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, to control entry across the border of the United States that, in routine circumstances, protects United States sovereignty and prevents entry of aliens who pose threats to public health or national security. 90 Fed. Reg. at 8333. But the INA's screening provisions "can be wholly ineffective in the border environment, where access to necessary information is limited for aliens who have traveled from countries around the world to enter the United States illegally, or when the system is overwhelmed, leading to the unauthorized entry of innumerable illegal aliens into the United States." *Id.*

"Due to significant information gaps—particularly in the border environment—and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by" 8 U.S.C. § 1182(a)(2)–(3). 90 Fed. Reg. at 8333. "Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials." *Id.* "The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other transnational criminal organizations on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people." *Id.*

The Federal Government also "currently lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-

- 3 -

health concern, as required by" 8 U.S.C. § 1182(a)(1). 90 Fed. Reg. at 8334. "As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States." *Id.* "Over the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States." *Id.* "The sheer number of aliens entering the United States has overwhelmed the system and rendered many of the INA's provisions ineffective, including those . . . intended to prevent aliens posing threats to public health, safety, and national security from entering the United States." *Id.* "As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide." *Id.*

The President thus determined that "the current situation at the southern border qualifies as an invasion." 90 Fed. Reg. at 8335. Accordingly, to address this situation, the President invoked his authority under 8 U.S.C. §§ 1182(f) and 1185(a) and found "that the entry into the United States . . . of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States," and thus suspended the "entry into the United States of such aliens" until "a finding that the invasion at the southern border has ceased." Proclamation § 1. The Proclamation further restricts "aliens engaged in the invasion across the southern border" from "invoking the provisions of the INA that would permit their continued presence in the United States, including, but not limited to" 8 U.S.C. § 1158 (the INA's asylum provisions), until the President issues "a finding that the invasion at the southern border has ceased." Proclamation § 2.

Additionally, the President determined "that the entry into the United States . . . of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of" 8 U.S.C. § 1182(a)(1)–(3), "is detrimental to the interests of the United States"; he therefore suspended "entry into the United States

- 4 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of such aliens" and "restrict[ed] their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to" 8 U.S.C. § 1158. Proclamation § 3. Finally, the President invoked his "express and inherent powers in Article II of the Constitution of the United States," including "control over foreign affairs," to suspend "the physical entry of any alien engaged in the invasion across the southern border of the United States" until the President issues "a finding that the invasion at the southern border has ceased." Proclamation § 4.

Implementation of the Proclamation. In accordance with the Proclamation, aliens who cross the southern land border between ports of entry are subject to the Proclamation's suspension and restrictions on entry. Aliens who fall into this category (other than unaccompanied alien children ("UAC")) and are encountered and apprehended by U.S. Border Patrol ("USBP") agents, may be processed for expedited removal or for direct repatriation under Section 1182(f). Ex. 2. Such aliens are not permitted to apply for asylum under 8 U.S.C. § 1158 or statutory withholding of removal under 8 U.S.C. § 1231(b)(3) as these are "provisions of the INA that would permit their continued presence in the United States." Ex. 1, Proclamation § 2. Aliens who manifest a fear related to the country to which U.S. Customs and Border Protection ("CBP") intends to repatriate or remove them, however, will be referred to U.S. Citizenship and Immigration Services ("USCIS") for an assessment to determine if it is more likely than not that the alien will be tortured in the designated country of return or removal in accordance with the Convention Against Torture ("CAT"). Exs 2, 3, 6. USCIS provides the referring entity (CBP or U.S. Immigration and Customs Enforcement ("ICE"), if CBP transferred to ICE custody) with the results of the CAT assessment. Ex. 6. If there is a positive CAT assessment, the alien may be served with a Notice to Appear in removal proceedings for further consideration of the request for CAT protection by an immigration judge ("IJ"), or another country may be designated for repatriation or removal. If an alien subject to the Proclamation does not manifest fear of return to the designated country of return, or if the CAT assessment is negative, CBP or

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ICE may proceed with repatriation or removal to the alien's home country or a third country.

The Proclamation also prevents the entry of aliens at any border or port of entry who have not provided sufficient medical information and reliable criminal history and background information to enable fulfillment of the requirements of 8 U.S.C. §§ 1182(a)(1)-(3). Ex. 1, Proclamation § 3. At ports of entry, CBP officers will generally not permit aliens (other than UACs) who lack lawful permanent resident status or valid entry documents or authorizations to cross the international boundary to enter the United States. Ex. 4. Aliens subject to Section 3 of the Proclamation who nonetheless cross the border will be processed for expedited removal or direct repatriation and are not provided the opportunity to seek asylum or statutory withholding of removal. Exs. 4, 5. If the alien manifests fear, he is referred to USCIS for a CAT screening. *See* Exs. 4, 5. Based on the outcome of the CAT assessment, CBP officers will further process the alien for repatriation or removal or immigration proceedings, and detention, as appropriate. *See* Exs. 4, 5.

Thus, under CBP's implementing procedures, some aliens who are subject to the Proclamations' suspensions or restrictions on entry are processed for repatriation to their home country or to a third country, pursuant to the authority in the Proclamation, including § 1182(f) (INA § 212(f)). Others are processed, pursuant to the authority in the Proclamation, including § 1182(f), for expedited removal and receive expedited removal orders under 8 U.S.C. § 1225(b)(1).

Attached hereto are declarations from CBP and USCIS with information the Court requested concerning aliens who have claimed asylum or fear and have been assessed for CAT or received a credible fear assessment. *See* Exs. 7, 8, 9; *see* Doc. 42 at 3. The government intends to supplement this information with a supplemental declaration from ICE. Because each agency can only accurately report on aliens who claimed asylum or fear while in that agency's custody, it is possible that some aliens may be double-counted, or represented twice, by the respective agencies' declarations based on the information

- 6 -

available to them at the time of filing.

Procedural History. Petitioner, Fatemeh Tabatabaeifar, was apprehended by immigration officials on February 23, 2025, after illegally crossing the southern border. *See* Doc. 28-1 (I-213). She was found inadmissible under § 1182(a)(7)(A)(i), issued a Notice and Order of Expedited Removal, and referred to USCIS for assessment of her claim to protection under the CAT. Doc. 28-2 (Expedited Removal Order); 28-3 (CAT Assessment). On March 21, 2025, the USCIS asylum officer who assessed Petitioner's CAT claim found that she did not establish that it was more likely than not that she would be tortured if removed to Iran. *Id.* In response to requests from Tabatabaeifar's counsel for an asylum interview and referral to an IJ, ICE informed counsel that Petitioner had been processed "under Expedited Removal – Section 212(f)" and that Petitioner's negative CAT assessment was not subject to IJ review. Doc. 1-3 at 1.

On April 14, 2025, Petitioner filed her Complaint, styled as a "Petition for Writ of Mandamus and Complaint for Declaratory Judgment." Doc. 1. The Complaint seeks to compel the Respondents, USCIS officials and other officials of the Department of Homeland Security ("DHS") and its components, "to conduct a proper credible fear interview for the Petitioner under the asylum standard pursuant to 8 C.F.R. § 208.30(e)(2)" and "to refer Petitioner's credible fear determination of Convention Against Torture" to an IJ for review "as required by 8 C.F.R. § 207.30(g)(2)(iv)(A)." *Id.* at 1-2. The Complaint asserts four causes of action against the Government: Count I requests a writ of mandamus on the basis of the Government's failure to send Petitioner's case to the IJ for review. *Id.* at 9-10. Count II requests a writ of mandamus on the basis of the Government's failure to assess Petitioner's asylum claim through a credible fear interview. *Id.* at 11-12. Count III alleges the Government has violated the Administrative Procedure Act ("APA"), alleging that the Government acted "not in accordance with law" by failing to refer Petitioner to an IJ. *Id.* at 12. Count IV alleges the Government violated Petitioner's Fifth Amendment Due Process rights by failing to afford these procedures. *Id.* at 12-13. The Complaint asks the

Court to order the Government to provide Petitioner with a credible fear or asylum interview and referral to an IJ of any negative credible fear determination. *Id.* at 13.

On April 16, 2025, Petitioner filed a motion for a temporary restraining order and preliminary injunction, seeking individual relief. Doc. 8. After the government was served with the complaint, the Court held a telephonic hearing and, on May 1, 2025, issued an order restraining the Government from removing Petitioner for 14 days. Docs. 26, 27. On May 14, 2025, the Court granted Petitioner's motion for a preliminary injunction, enjoining the Government "from removing Petitioner from the United States prior to a complete assessment of her asylum claim, including a credible fear determination and an immigration judge's review, in accordance with 8 C.F.R. § 208.30 and 8 U.S.C. § 1225(b)(1)(B)(iii)(III)." Doc. 37 at 20. This Court concluded that, despite her receipt of an expedited removal order, Petitioner "was not subjected to any expedited removal proceedings pursuant to Section 1225(b)" and thus that the jurisdictional bars to review of expedited removal orders did not apply. *Id.* at 3-4. The Court then determined that § 1182(f) "is limited to only the power to restrict entry into the United States," *id.* at 9, and that by restricting access to asylum, the Proclamation "unlawfully override[s] particular provisions of the INA," *id.* at 11. It held that the President lacked authority under § 1182(f) and Articles II and IV of the Constitution to "restrict an alien's right to request asylum." *See id.* at 12, 13.

On May 29, 2025, having been enjoined from removing Petitioner, the government provided her a credible fear interview, and she received a positive credible fear determination. Exhibit 10 (Form I-870). On May 30, 2025, Petitioner was issued a notice to appear in removal proceedings under 8 U.S.C. § 1229a (Section 240 of the INA) and was scheduled for an initial hearing on June 12, 2025. Exhibit 11 (NTA).

On June 6, 2025, in a separate case, this Court entered an order temporarily restraining the government "from depriving those who have claimed asylum of their statutory and regulatory rights associated with asylum, such as the right to a credible fear

determination and an immigration judge's review under 8 C.F.R. § 208.30 and 8 U.S.C. §1225(b)(1)(B)(iii)(III) for the next 14 days throughout the jurisdiction of the United States District Court for the District of Arizona." *Togoev v. U.S. Attorney General*, No. 2:25-cv-01960, Doc. 6 (June 6, 2025). Relevant agencies issued guidance to the field regarding this order. *See* Ex. 8 at ¶ 6; Ex. 9 at ¶ 6; Ex. 12 at ¶ 16; *see* Doc. 42 at 3 (requesting information about "how the United States implemented the Temporary Restraining Order"). That case was subsequently dismissed by stipulation of the parties. *Togoev*, No. 2:25-cv-01960, Doc. 7 (June 11, 2025).

## LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008), which may issue only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). The moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A motion for a temporary restraining order or preliminary injunction must be denied if the court lacks subject matter jurisdiction over the claims. *Williams v. DOJ*, No. 2:24-cv-05406, 2024 WL 3915922, at *2 (C.D. Cal. July 25, 2024); *Sarah Kent, Inc. v. Stella*, No. 39-cv-00888, 1989 WL 139222, at *1 (C.D. Cal. Aug. 2, 1989).

## ARGUMENT

**I.    There is no Jurisdictional Basis for Nationwide or District-Wide Relief.**

**A. Petitioner's Claims Have Been Moot Since May 29, 2025.**

Petitioner Tabatabaeifar filed the instant motion two weeks after she received all of the relief she sought through this lawsuit: a credible fear interview. Having now received a positive credible fear determination, Petitioner is in removal proceedings under 8 U.S.C.

§ 1229a. Under such proceedings, she may apply for asylum or other forms of relief from protection or removal from an immigration judge, *see* 8 U.S.C. § 1229a(c)(4)(A), and, if she is denied relief or protection and ultimately ordered removed she can seek review from the Court of Appeals, *see* 8 U.S.C. § 1252(a)(1), (b). Petitioner has thus received relief that completely resolves her claims by providing her with access to the procedures she sought in this litigation (which Defendants provided after this Court said she could not be removed until those procedures were applied), and there is also no basis to her contention that she is at imminent risk of removal. *See* Doc. 39 ("Mot.") ¶ 26; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *The Presbyterian Church v. United States*, 870 F.2d 518, 528–29 (9th Cir. 1989) ("[W]hen injunctive relief is sought, litigants must demonstrate a credible threat of future injury.").

As Petitioner has received a credible fear interview and been referred to immigration court where she can apply for asylum, her claims, which seek to compel a credible fear interview with immigration-judge review of a negative determination, are moot. Mootness is "standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 556 (9th Cir. 2010) (internal quotation omitted). "A case that becomes moot at any point during the proceedings," "is no longer a 'Case' or 'Controversy' for purposes of Article III, and is outside the jurisdiction of the federal courts." *U.S. v. Sanchez-Gomez*, 584 U.S. 381, 385-86 (2018). The Court has an ongoing obligation to examine mootness as "an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (citation and quotation marks omitted). A case becomes moot when intervening circumstances mean "there is no longer a live controversy necessary for Article III jurisdiction." *Brach v. Newsom*, 38 F.4th 6, 11 (9th Cir. 2022) (en banc); *see also Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1208 (9th Cir. 2021). The "case or controversy" requirement mandates dismissal

"when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481 (1982). Here, Petitioner sought to compel the government to afford her certain procedures under the expedited removal statute and regulations. There can be no dispute that she has received those procedures. Petitioner thus no longer has any "legally cognizable interest in the outcome" of her claims, *Murphy*, 455 U.S. at 481, and there is no longer "any effective relief that can be granted by the court," *Brach*, 38 F.4th at 11; *see also Jiali T. v. Mayorkas*, 2023 WL 5985509, at *2 (S.D. Cal. Sept. 13, 2023) (claims are moot where plaintiffs "received all of the relief they sought").

No mootness exceptions apply here. The "capable of repetition yet evading review" exception "applies only in exceptional situations, where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that *the same complaining party* will be subject to the same action again." *Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018) (emphasis added). Here, there is no reasonable expectation that the complaining party—Petitioner Tabatabeifar—will be subject to the same action again. She is currently in removal proceedings that will resolve her asylum claims, and she does not argue that she is likely to be subject to the Proclamation again. Even if Petitioner is ultimately removed and again re-enters by crossing the border illegally while the Proclamation is still in place, her prior removal order would be subject to reinstatement under § 1231(a)(5), and asylum would thus be unavailable. 8 U.S.C. § 1231(a)(5) (providing that aliens subject to reinstated removal orders are "not eligible and may not apply for any relief" under the INA). Nor is the ability to challenge the Proclamation of "'*inherently* limited duration.'" *Hamamoto*, 881 F.3d at 722 (emphasis in original). Indeed, someone who is removed upon application of the Proclamation's suspension and limitation on entry could still conceivably challenge its application from abroad (although the available relief may be limited). Although there are mootness exceptions that may apply to class representatives, this is not a putative class action. *See*

- 11 -

*Doe v. Wolf*, 424 F. Supp. 3d 1028, 1038 (S.D. Cal. 2020) (discussing mootness exceptions for proposed class representatives where claims are "inherently transitory").

To the extent the Court suggests that the government has "evade[d] judicial review" by affording relief to Petitioner and others who have filed actions in this District (Doc. 42 at 2)—in almost all cases after the presiding court had already enjoined the petitioners' removal—that characterization does not account for the full context. As already noted, the government has not sought to "evade" review. The government is currently defending against a programmatic and putative class action challenge to the very same practices in the D.C. District Court (the only proper venue for challenges to expedited removal practices, *see infra* § I(B)). *See RAICES v. Noem*, No. 1:25-cv-00306 (D.D.C. filed Feb. 3, 2025). And not one of the Arizona litigants identified by the Court (Doc. 42 at 1) whose case was voluntarily dismissed had filed their case as a putative class action or even purported to seek relief for anyone other than themselves or their family members. *See Davtyan v. U.S. Attorney General*, 2:25-cv-01826, Doc. 1 (May 28, 2025); *Togoev v. U.S. Attorney General*, No. 2:25-cv-01960, Doc. 1 (June 6, 2025); *Kunitskii v. Figueroa*, No. 2:25-cv-1845, Doc. 1 (May 29, 2025); *Kunitskaia v. Rivas*, No. 2:25-cv-1846, Doc. 1 (May 28, 2025).[1] As the Court acknowledged, Defendants merely agreed to provide those individual claimants with the relief they requested rather than expend resources litigating the cases. Even in this case, the Petition (as opposed to the instant motion) likewise seeks only *individual* relief.[2]

---

[1] Two of these petitions expressly sought, as alternative relief, stays of removal pending the outcome of *RAICES v. Noem*. *Kunitskii v. Figueroa*, No. 2:25-cv-1845, Doc. 1 at 11; *Kunitskaia v. Rivas*, No. 2:25-cv-1846, Doc. 1 at 1.

[2] The remaining case identified by the Court (Doc. 42 at 1, 4), *Kniazev v. Kline*, No. 2:25-cv-2036, Doc. 1 (June 11, 2025), was served on June 16, 2025. The petitioner received a negative CAT assessment on April 21, 2025 while in custody in Otay Mesa, California. *See* Ex. 12 at ¶¶ 5, 7–8. For staging for purposes of removal, the petitioner was transferred to Arizona detention facilities and staging centers, and on June 10, 2025, he was transferred from Arizona to Prairieland, Texas, and was removed on June 12, 2025. *See id.* at ¶¶ 11–12, 17–19.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The exception for voluntary cessation does not apply here. *Nevada v. United States*, 783 F. App'x 700, 703 (9th Cir. 2019) (voluntary cessation doctrine did not apply where the remedy sought was no longer necessary). To begin with, there was nothing voluntary about providing relief to Plaintiff: this Court issued a preliminary injunction that would prevent Petitioner's removal under the Proclamation. The Executive was thus presented with the Hobson's choice of acquiescing in her continued unlawful presence indefinitely or giving her a credible fear interview to begin removal proceedings. The Executive's acquiescence in this Court's injunction does not constitute voluntary cessation. Nor has Petitioner submitted any evidence to suggest that she is reasonably likely to again be subject to the conduct she complained of or to overcome the presumption of good faith that applies in this context. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 189 (2000); *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) ("We presume that a government entity is acting in good faith when it changes its policy.").

### B. Nationwide Injunctive Relief is Foreclosed By Settled Constitutional Constraints and Statutory Limits.

Even if Tabatabaeifar's claims were not moot, and even assuming she could satisfy the other requirements for injunctive relief (she cannot), there is no basis to enter nationwide relief.

***Well-settled Constitutional and Equitable Principles Require Injunctions Be No Broader than Necessary to Provide Relief to the Parties Before the Court.*** Nationwide injunctions are the rare exception, not the rule, as relief "must be narrowly tailored to remedy the specific harm shown." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (vacating nationwide injunction where record did not support that the harms shown by the California plaintiffs justified nationwide injunction, remanding "for a more searching inquiry into whether [the] case justifies the breadth of the injunction imposed"). The "usual rule" is "that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).

- 13 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Equitable remedies should redress only the injuries sustained by a particular plaintiff in a particular case," as this is "consistent with the courts' longstanding view that the judicial power is limited to the resolution of individual cases and controversies." *Brnovich v. Biden*, 562 F. Supp. 3d 123, 167 (D. Ariz. 2022) (citing *DHS v. New York, U.S.*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring)), *rev'd on other grounds by Mayes v. Biden*, 67 F.4th 921, 945 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023).

In the absence of a certified class, injunctive relief may only cover the individual plaintiffs. *Nat'l Ctr. for Immigrants Rts, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996). Although broader relief can be granted where "necessary to remedy a plaintiff's harm," *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019), that is not the case here, as Petitioner has already received complete relief through an individualized remedy, *see California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (broader relief must be "*necessary* to give prevailing parties the relief to which they are entitled." (emphasis in original)). Indeed, Tabatabaeifar's motion does not even *argue* that the nationwide injunction she now seeks would remedy any injury *to her*.

Instead, the only justification that Plaintiff cites for nationwide relief is a purported "need for uniformity in immigration policy." Mot. ¶¶ 7, 9–10, 31, 39. Yet, as discussed below, the INA does not support this justification, as Congress has expressly prohibited nationwide relief in the context of immigration detention and removal. *See infra* § I(B) (discussing 8 U.S.C. § 1252(f)(1)). Further, there are often differing views among the lower courts as to the proper interpretation and application of the law, including in immigration matters. Uniformity is not meant to be achieved through single-judge nationwide injunctions, but through resolution of the legal issues through the appellate process and, ultimately, a Supreme Court decision. That is particularly true where a case only involves a single plaintiff, who can hardly assert any cognizable interest in the uniform application

- 14 -

of federal immigration policy where she has already received the entirety of the relief sought by her complaint/petition.

Nationwide injunctions also stymie the development of these legal views on immigration policy through case-by-case development. "To permit such broad injunctions as a general rule, without an articulated connection to a plaintiff's particular harm, would unnecessarily 'stymie novel legal challenges and robust debate' arising in different judicial districts." *E. Bay Sanctuary Covenant*, 934 F.3d at 1029. "The Supreme Court has repeatedly emphasized that nationwide injunctions have detrimental consequences to the development of law and deprive appellate courts of a wider range of perspectives." *Azar*, 911 F.3d at 583 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *United States v. Mendoza*, 464 U.S. 154, 160 (1984), and *Arizona v. Evans*, 514 U.S. 1, 23 n.1, (1995) (Ginsburg, J., dissenting) ("We have in many instances recognized that when frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by this Court")).

**Congress Has Doubly Barred The Nationwide Injunction Sought Here.** In any event, a nationwide injunction is unavailable because the INA precludes universal injunctive relief pertaining to the application of expedited removal procedures and requires claims challenging such procedures to be brought in the District for the District of Columbia within 60 days of the challenged procedures' implementation.

*First*, Congress has provided that this Court may not hear claims like Petitioner's that challenge how expedited removal processes are conducted. Her primary claim is that, under the Proclamation, the government is failing to follow the requirements of the expedited removal statute, 8 U.S.C. § 1225(b)(1)(B), and its implementing regulations. *See, e.g.*, Doc. 1 at pp. 1–2, 6–14; Mot. ¶¶ 18, 20. And Petitioner, like many others subject to the Proclamation, received an expedited removal order under § 1225(b)(1) pursuant to the Proclamation's authority. *See* Doc. 28-2; *supra* at 5–6 (discussing procedures under which

- 15 -

some aliens subject to the Proclamation's suspension and restrictions on entry are processed for direct repatriation, while others are processed for expedited removal). Challenges to the "application" of § 1225(b)(1) (including credible fear determinations), and "any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)," are barred under 8 U.S.C. § 1252(a)(2)(A), which eliminates jurisdiction for such claims unless expressly permitted by 8 U.S.C. § 1252(e). *See* 8 U.S.C. § 1252(a)(2)(A)(i), (ii), (iv); *Make the Rd. New York v. Wolf*, 962 F.3d 612, 626 (D.C. Cir. 2020). And § 1252(e)(1) provides that "no court may . . . enter declaratory, injunctive, or other equitable relief" pertaining to an order of expedited removal except as "specifically authorized in a subsequent paragraph of this subsection [(e)]."

Petitioner here received an expedited removal order. *See* Doc. 28-2. Further, she challenges the Government's practices in applying expedited removal without affording certain expedited removal procedures (principally the ability to claim asylum) because of the Proclamation. Accordingly, the limitations on judicial review and relief contained §§ 1252(a)(2)(A) and (e) apply, even if the Court disagrees the Government's practices comply with § 1225(b). *See* Doc. 37 at 3. And her claims do not fall into § 1252(e)'s carve-outs. Section 1252(e)(2) provides that the sole means of review of an order of expedited removal is a habeas proceeding to determine whether the petitioner is an alien, whether the petitioner was ordered removed under such section, and whether the petitioner can prove that she is exempted from expedited removal procedures. *See* 8 U.S.C. § 1252(e)(2) (emphasis added). "There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal." 8 U.S.C. § 1252(e)(5).

Section 1252(e)(3) allows for systemic challenges to the implementation of expedited removal, but such suits may only be filed in the District Court for the District of Columbia within 60 days of the first implementation of the challenged directive, guideline, or written procedure. *See* 8 U.S.C. § 1252(e)(3)(A), (B).

*Second*, the Court lacks authority to issue a nationwide or district-wide injunction against the implementation of the Proclamation because the requested injunction would require Defendants to provide certain expedited removal procedures under 8 U.S.C. § 1225(b)(1) to those other than to the individual petitioner. Such relief is squarely barred by 8 U.S.C. § 1252(f)(1), which "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022), except in "individual cases" of aliens already in immigration proceedings, *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 481–82 (1999). The statute provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,[3] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

Petitioner's claims and requested injunction expressly seek to enforce certain expedited removal procedures under the covered provision 8 U.S.C. § 1225(b), where aliens may raise claims for relief or protection from removal, including asylum or CAT protection. *See, e.g.*, Doc. 1 at pp. 1–2, 6–14; Mot. ¶¶ 18, 20; *id.* at pp. 1, 20. But even if Petitioner's claims for relief did not directly seek to enforce a covered statute, prohibiting

---

[3] This reference to "the provisions of part IV of this subchapter, as amended by [IIRIRA]" is often cited as referring to 8 U.S.C. §§ 1221-1232. *See, e.g.*, *Aleman Gonzalez*, 596 U.S. at 549. However, the text of the statute as enacted referred to "chapter 4 of title II" of the INA, which is not completely coextensive with "part IV of this subchapter" as set forth in the codified version of the statute. *See Moreno Galvez v. Jaddou*, 52 F. 4th 821, 830 (9th Cir. 2022). The statutory provision at issue here—8 U.S.C. § 1225—is contained in "chapter 4 of title II" of the INA and thus covered by § 1252.

- 17 -

the wholesale enforcement of the Proclamation would violate § 1252(f)(1) because it would compel DHS to provide aliens with particular credible fear procedures under § 1225(b) and to implement expedited removal under that statute in a particular way. Specifically, such a blanket injunction would compel immigration officers to "conduct interviews of aliens," *id.* § 1225(b)(1)(B)(i), and if the aliens are determined to have a credible fear, to "detain[]" them "for further consideration of the application for asylum" in proceedings before an immigration judge, *id.* § 1225(b)(1)(B)(ii). Or, it would compel DHS to place aliens in removal proceedings under § 1229a, where the aliens may attempt to satisfy their "burden of proof to establish" they warrant relief from removal. *Id.* § 1229a(c)(4)(A). Compelling immigration officers to operate these provisions in such a manner—or any specific manner—is precisely what Congress prohibited. *See Aleman Gonzalez*, 596 U.S. at 550 (Section 1252(f)(1)'s prohibition applies "not just to the statute itself but to the way that it is being carried out").

Thus, it does not matter that Petitioner argues that her requested relief is what is required by the covered statutes. The Supreme Court in *Aleman Gonzalez* concluded "even injunctions that 'enjoin or restrain' the 'unlawful' or 'improper operation,' *i.e.*, violations, of § 1252(f)(1)'s covered provisions clash with that statute's remedy bar." *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1042 (S.D. Cal. 2022) (quoting *Aleman Gonzalez*, 596 U.S. at 552); *see also Hamama v. Adducci*, 912 F.3d 869, 879-80 (6th Cir. 2018) (rejecting as "implausible on its face" the argument that that Section 1252(f)(1) permits injunctions which seek to "ensure [the covered provisions] are correctly enforced").[4]

---

[4] Petitioner may argue that her requested relief is permissible despite § 1252(f)(1) because an injunction against the Proclamation is not an injunction against the covered INA provisions. *See also* Doc. 37 at 4–5. That argument has already been considered and persuasively rejected by a district judge in the Southern District of California. In the *Al Otro Lado* litigation, a district court considered whether to enjoin, as a remedy for asserted violations of Sections 1158 and 1225, CBP's practice of regulating the pace at which undocumented aliens entered the ports of entry along the U.S.-Mexico border. *See, e.g.*, *Al Otro Lado*, 619 F. Supp. 3d at 1034–35. Although the court held CBP's practice unlawful, it nevertheless concluded it could not enjoin the practice because such an order would

- 18 -

**II.    Petitioner Cannot Satisfy the Prerequisites for Injunctive Relief.**

**A. Petitioner is Unlikely to Succeed on Her Claims.**

Petitioner is unlikely to succeed on her claims because the Court lacks continuing jurisdiction over them, as discussed above (*supra* § I(A)). *See, e.g.*, *Williams*, 2024 WL 3915922, at \*2. Even leaving aside this threshold jurisdictional hurdle, Petitioner's claims cannot succeed because the Proclamation is not reviewable and is in any event a lawful exercise of Presidential authority under §§ 1182(f) and 1185(a), as well as under Articles II and IV of the Constitution.

***i.    The Proclamation is Not Reviewable.***

There is no source of law allowing judicial review of the Proclamation.

*First*, the APA does not provide a cause of action for judicial review of a Presidential Proclamation. The President is not an agency, and his actions are not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (holding that the President's "actions are not subject to [the APA's] requirements" and are thus not reviewable under the APA). Plaintiffs' request to enjoin the Proclamation thus cannot be based in the APA or its standards. *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018). As the Ninth Circuit has explained, "[t]he scope of our review [under

---

compel the government to discharge its obligations under Section 1225. The court reasoned: "Although § 1158 and § 1225 in no uncertain terms impose upon [DHS and CBP] a mandatory ministerial duty to inspect and refer asylum seekers in the process of arriving at Class A [ports of entry], *Aleman Gonzalez* appears to suggest that Defendants have *carte blanche* to refuse to do so, as long as they present to a lower court a *claimed* ground for their refusal, even if a federal court ultimately finds that basis meritless." *Id.* at 1044.

So too here. Although Petitioner seeks a blanket injunction against the implementation or enforcement of the Proclamation to aliens within the United States, that relief would compel the government to operate § 1225(b) in a specific manner, and it would do so as to everyone who enters the United States in violation of the Proclamation's suspension on entry: thus, as to more than "an individual alien against whom proceedings ... have been initiated." 8 U.S.C. § 1252(f)(1). Indeed, this is precisely the relief Petitioner seeks: requiring the government to "use the ... procedural mechanisms as required under 8 U.S.C. § 1225(b)(1) and [implementing regulation] 8 C.F.R. § 208.30." Mot. at 16. Consequently, Section 1252(f)(1) prohibits relief that would enjoin the implementation or enforcement of the Proclamation as to anyone beyond the individual Petitioner.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the APA] ... is limited to 'agency action,' and the President is not an 'agency.'" *Id.* at 770. "Accordingly, the President's 'actions are not subject to [APA] requirements," and this Court "do[es] not have any authority under § 706 of the APA to review" a Presidential Proclamation issued under 8 U.S.C. § 1182(f). *Id.*; *see also Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (refusing to hold that the President is an "agency" within the meaning of the APA); *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex.), *aff'd on reh'g en banc,* 63 F.4th 366 (5th Cir. 2023) (declining to consider APA claims challenging a vaccine mandate, stating "there is nothing for the court to review under the APA" because "executive orders are not reviewable under the APA."); *Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1359 (Fed. Cir. 2006) ("Motion Systems acknowledges that it cannot challenge the President's actions under the APA because the President is not an 'agency.'").

*Second*, the President cannot be enjoined in the performance of his official duties—including his authority to suspend entry under the Proclamation. As the Supreme Court has long recognized, federal courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *see Franklin*, 505 U.S. at 802 (plurality opinion) (noting that "grant of injunctive relief against the President [ ] is extraordinary, and should have raised judicial eyebrows"). This limitation reflects the respect due to the President's "unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President"). Petitioner may contend that the claim for injunctive relief fits within a narrow exception that the Supreme Court might have allowed for injunctive claims seeking to direct the President to perform "ministerial" functions. *See Franklin*, 505 U.S. at 802–03 (noting that *Mississippi* "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial duty'"); *see also Mississippi*,

71 U.S. at 500 (defining "ministerial duty" as "one in respect to which nothing is left to discretion"). But that possible exception has no application here, where the Proclamation was issued pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a), which accord enormous discretion to the President to suspend entry and impose restrictions on any and all aliens.

*Third,* the Proclamation itself does not create a cause of action. The statutes that the Proclamation invokes are 8 U.S.C. §§ 1182(f) and 1185(a), which "vest[] the President with ample power to impose entry restrictions" and "exude[] deference to the President in every clause." *Hawaii*, 585 U.S. at 684 (quotation marks omitted).

By its terms, these provisions grant the President broad authority over the administration of the immigration system, confirming his discretion at every turn. That far-reaching scope of the President's § 1182(f) power was recognized from the outset: when the Immigration and Nationality Act of 1952 was being drafted, legislators characterized the provision as an exceedingly broad one that would allow "the President the power to suspend all immigration whenever he feels it is the national interest to do so." 98 Cong. Rec. 4249 (1952) (letter from Rhoads Murphey, Friends Comm. on National Legislation); *id.* at 4304–05, 4423, 5114 (statements of Reps. Celler and Multer and Sen. Lehman); *see also* S. Rep. No. 137, 82d Cong., 2d Sess. Pt. 2, at 4 (1952) (minority views); *see generally* S. Rep. No. 1137, 82d Cong., 2d Sess., at 14 (1952); H. Rep. No. 1365, 82d Cong., 2d Sess., at 53 (1952). Thus, the President's reliance on § 1182(f) to impose "restrictions on entry for aliens invading the United States" is in keeping with the expansive understanding of executive powers that consistently has attached to the provision. *See* Ex. 1, Proclamation § 2; *see, e.g.*, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187 (1993) ("It is perfectly clear that 8 U.S.C. § 1182(f) ... grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores.").

Section 1185(a) likewise confirms the breadth of the President's authority:

1

2
3
4

> Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to *such limitations and exceptions as the President may prescribe*[.]

5   8 U.S.C. § 1185(a)(1). That statute does not require any predicate findings at all, but simply

6   gives the President the authority to restrict entry to the United States according to "such

7   limitations and exceptions as the President may prescribe." *Id.*; *see Haig v. Agee*, 453 U.S.

8   280, 297 (1981) (construing similar language in § 1185(b)—which governs United States

9   citizens—as "le[aving] the power to make exceptions exclusively in the hands of the

10  Executive"); *Allende v. Shultz*, 845 F.2d 1111, 1118 & n.13 (1st Cir. 1988). As with

11  § 1182(f), the history of § 1185(a) confirms the broad discretion accorded to the President

12  over immigration matters: the statute was originally enacted in 1918 as a wartime measure

13  authorizing restrictions if the President found that "the public safety require[d]" them. 40

14  Stat. 559 (1918). In 1978, Congress broadened the statute even further by removing not

15  only the wartime requirement but also the requirement for *any* predicate finding for

16  restrictions the President might order. *See* Pub. L. No. 95-426, sec. 707(a), 92 Stat. 963,

17  992–93 (1978).

18      In short, based on their plain text, these statutes provide no basis for judicial second-

19  guessing of the President's determinations about what restrictions to "prescribe" or what

20  restrictions are necessary to avoid "detriment[] to the interests of the United States."

21  Congress specifically entrusted those matters to the President, and 'the power to *expel* or

22  exclude aliens as a fundamental sovereign attribute exercised" by the political branches

23  remains "largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)

24  (emphasis added). In fact, "[t]he right to do so stems not alone from legislative power but

25  is *inherent* in the executive power to control the foreign affairs of the nation." *U.S. ex rel*

26  *Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (emphasis added); *see Am. Ins. Ass'n v.*

27  *Garamendi*, 539 U.S. 396, 414 (2003) (holding that the "historical gloss on the executive

28

Power vested in Article II of the Constitution has recognized the President's vast share of responsibility for the conduct of our foreign relations" (internal quotation marks omitted)).

While this Court has stated that the President's power under § 1182(f) is limited to "restrict[ing] entry into the United States," Doc. 37 at 9, 11, this reading fails to account for the "long-established rule"—which undergirds both Sections 1182(f) and 1185(a)— that "*the power over aliens* is of a political character and therefore subject only to narrow judicial review." *See Fiallo*, 430 U.S. at 792 (emphasis added) (quotation marks omitted); *see also Hawaii*, 585 U.S. at 686, 704 (holding that "plaintiffs' request for a searching inquiry into the persuasiveness of the President's justifications [was] inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e] sphere" of immigration, which "overlap[s] with the area of national security," among others (quotation marks omitted)). Here, the restrictions introduced by the President under Sections 1182(f) and 1185(a) are inextricably linked both to the suspension on entry and to the President's "broad power over the creation and administration of the immigration system," which necessarily includes the regulation of such discretionary benefits as asylum. *Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring in judgment). Thus, in addition to the clear statutory basis on which the Proclamation rests, the President's decision to impose restrictions in the national interest is a fundamental act of sovereignty and consistent with his Executive duty to maintain effective control over the immigration system as a whole. *Knauff*, 338 U.S. at 542–43.

The Proclamation is a valid exercise of the President's authority under §§ 1182(f) and 1185(a), and is not subject to judicial review or injunction—regardless of how Petitioner has framed her claims. *Cf. Hawaii*, 585 U.S. at 683 (assuming without deciding that plaintiffs' statutory claims were reviewable).

*Fourth*, the President's invocation of the Invasion Clause of the Constitution, Article IV, § 4, is also not reviewable. The federal courts have consistently held that the determination by the Executive of whether an "invasion" is occurring so as to trigger this

- 23 -

clause presents a nonjusticiable political question. *See*, *e.g.*, *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (collecting cases). *California* thus bars review of the President's reliance on the Invasion Clause here.

### ii. Petitioner's Mandamus Challenge Lacks Merit Because the Proclamation Lawfully Restricts Access to Asylum Procedures for Those Subject to the Suspension on Entry.

But even if Petitioner's challenge to the Proclamation were reviewable, she is not likely to succeed on the merits of her claims. Counts I and II of the Complaint seek to compel the government to provide her with a credible fear determination for asylum that is subject to review by an IJ as provided for under the expedited removal statute at 8 U.S.C. § 1225(b)(1). Doc. 1 at pp. 9–12. The Court previously found that Petitioner was likely to succeed on this claim because, it determined, the government's duty to provide these procedures was "clear and certain." Doc. 37 at 17. However, the duty is not certain for those subject to the Proclamation's suspensions on entry, because the Proclamation lawfully restricts them from invoking asylum protections—including through the expedited removal procedures. To be effective, the Proclamation's suspension on entry must necessarily encompass the ability to expel those who enter unlawfully in violation of that suspension. A contrary construction of § 1182(f) would unlawfully cabin the President's statutory and inherent constitutional authority.

*First*, Section 1182(f) necessarily authorizes repatriation of illegal immigrants who manage to gain physical entry to the United States notwithstanding a Proclamation prohibiting such entry. The language of the statute is focused on the point of entry, which contemplates a suspension of physical entry at the border (or, if abroad, a determination of inadmissibility before a consular officer). It would render the statute's authority to prohibit physical entry ineffective if that authority did not also permit the President to "take action against a covered alien who disregarded the prohibition and managed to set foot on U.S. soil." *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 729 (D.C. Cir. 2022). To conclude otherwise would establish a loophole that would swallow the rule and render a suspension

- 24 -

a dead letter. *See*, *e.g.*, *Cnty of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 178–79 (2020) (rejecting interpretation that would have "create[d] . . . a large and obvious loophole in one of the key regulatory" provisions of the statute); *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 421 (1983) (Congress does not "paralyze with one hand what it sought to promote with the other"); *The Emily*, 22 U.S. (Wheat.) 381, 390 (1824) (rejecting interpretation of statute that would render "evasion of the law . . . almost certain"). Courts should avoid interpretations of statutes that would allow for such evasion of the statute's primary purpose. *See Abramski v. United States*, 573 U.S. 169 (2014) (interpreting provisions of Gun Control Act regulating firearms sales to treat the real buyer, rather than the straw purchase, as the "transferee" so as not to "undermine . . . the gun law's core provisions"); *Cnty of Maui*, 590 U.S. at 178–79.

Indeed, the Supreme Court has already interpreted Section 1182(f) in a far more expansive fashion. In *Sale v. Haitian Centers Council, Inc.*, the Supreme Court opined that Section 1182(f) would authorize a naval blockade outside the territorial waters of the United States that would "deny illegal Haitian migrants the ability to disembark on our shores." 509 U.S. at 187. Rather than hold to a crabbed view of the statute as permitting the government to bar entry at the border alone or simply to conclude that an intending immigrant is inadmissible, the Supreme Court reasonably held that the government could take action pursuant to Section 1182(f) to pretermit an alien's ability to reach the border in the first place.

The exercise of authority in this case is simply the other side of the *Sale* coin; rather than taking preventative action to ensure that aliens subject to the Proclamation do not reach the border, the instant Proclamation seeks to ensure that aliens who physically enter the United States *despite* the suspension of entry can be repatriated. If anything, the exercise of authority in this case is more compelling than in *Sale*. In *Sale*, the Executive sought only to proactively enforce the suspension of entry via interdiction. Here, in contrast, the mechanism of expulsion is necessary to ensure the utility of the Proclamation

- 25 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

itself. That Proclamation is concerned with the ongoing influx of illegal immigrants into the United States.

This interpretation is consistent with the anti-circumvention principle that the D.C. Circuit recognized in the related context of expulsions under Title 42. *See Huisha-Huisha*, 27 F.4th 718. In that case, as here, the court was interpreting a statutory provision that ostensibly only barred entry or "introduction." *See* 42 U.S.C. § 265 (titled "Suspension of entries and imports," and providing "the power to prohibit, whole or in part, the introduction of persons . . ."). There the D.C. Circuit explicitly rejected the contention that this statute did not extend to the *expulsion* of aliens who entered in violation of a Title 42 prohibition on introducing persons into the United States. Rather, in holding that the government could expel aliens under the authority of Title 42, the court reasoned that the authority to suspend entry would "be rendered largely nugatory if the Executive could not take any action against a[n otherwise] covered alien who disregarded the prohibition and managed to set foot on U.S. soil." *Huisha-Huisha*, 27 F.4th at 729.

That same reasoning applies—and is controlling—here; absent the repatriation authority contained in the Proclamation, the status quo pre-Proclamation would prevail, any physical entrant would be processed through some form of Title 8 removal proceedings, and the entire purpose of the Proclamation would be vitiated. In effect, the entry bar would be toothless because anyone who violated it would gain all the same opportunities to claim asylum that they would enjoy from a lawful entry into the United States.

The authority under Section 1182(f) is not limited to imposing new requirements or limitations on admissibility, *i.e.*, the terms under which an alien may seek "lawful entry" into the United States. To be sure, the President's authority under Section 1182(f) unquestionably encompasses the authority to "impose additional limitations on entry beyond the grounds for exclusion set forth in the INA." *Hawaii*, 585 U.S. at 691; *accord Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986). Yet the language of

§ 1182(f)[5] and the decision in *Sale* points to a more expansive construction of the provision as permitting actions to ensure aliens cannot gain physical entry during a period of suspension, which logically extends to permissible action to summarily remove or repatriate those who *do* gain entry *despite* the suspension. Moreover, there is no *textual* limitation in the statute that would bar removal of aliens who entered the United States during a period where entry had been suspended by proclamation, *see generally* 8 U.S.C. § 1182(f), and the statute otherwise "exudes deference to the President in every clause," *Hawaii*, 585 U.S. at 684. That deference encompasses the Proclamation, suspending entry *and* providing for the expulsion of aliens who unlawfully enter the United States during periods where entry has been suspended. Nor does the placement of Section 1182(f) within the INA's inadmissibility provision otherwise limit the breadth of the authority therein granted. *Cf. Pennsylvania Dept. of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a statute ... cannot limit the plain meaning of the text.").

Even without the extraordinarily deferential language of § 1182(f), the President's action here would be supported by the inherent authority of the Executive over admissions decisions. Since the advent of federal immigration law in the 1880s, the Supreme Court has recognized that the power of excluding aliens from U.S. territory is an inherent attribute of sovereignty exercised by the political branches of the government. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) ("It results that the investment of the federal government with the powers of external sovereignty did not depend upon the

---

[5] At the time § 1182(f) was adopted, the term "entry" was defined in the INA as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise." Immigration and Nationality Act of 1952, Pub. L. No. 414, Ch. 477 Sec. 101(a)(13) (June 27, 1952); *see also id.* Sec. 212(e) (provision now codified at 8 U.S.C. § 1182(f)). Amendments to the INA in 1996 replaced the defined term "entry" with the defined terms "admission" and "admitted," defined as "*lawful* entry . . . after inspection and authorization," Pub. L. No. 104-208 Division C, Sec. 301(a) (Sept. 30, 1996) (codified at 8 U.S.C. § 1101(a)(13)). This amendment accounted for the fact that aliens who have never been admitted are generally treated for immigration purposes as "not considered to have entered the country." *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020). But the amendments did not replace the term "entry" in § 1182(f) with the term "admission."

affirmative grants of the Constitution."); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe."). Although "normally Congress supplies the conditions of the privilege of entry into the United States," "because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power" without raising delegation concerns. *Knauff*, 338 U.S. at 543. As the Supreme Court has repeatedly held, Article II confers upon the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952); *Knauff*, 338 U.S. at 542; *Curtiss-Wright*, 299 U.S. at 320.  Thus, where, as here, "the President acts pursuant to an express or implied authorization of Congress," *i.e.* 8 U.S.C. §§ 1182(f) and 1185(a)(1), coupled with the President's own Article II powers over foreign affairs and national security, "his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (similar).

For this reason, "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an *inherent executive power*." *Knauff*, 338 U.S. at 542 (emphasis added). This inherent authority to *exclude* also extends to repatriation in the context of this case, which involves aliens who have only just crossed the border. "The right of a nation to expel or deport foreigners who have not been naturalized or taken any steps towards becoming citizens of the country, rests upon the same grounds, and is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country." *Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893). The circumstances of this case support a residual authority to

repatriate aliens who enter when a Presidential Proclamation has suspended entry pursuant to § 1182(f). As the Supreme Court opined in *Knauff*, "because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power ... [and] Executive officers may be entrusted with the duty of specifying the procedures for carrying out the congressional intent." *Id*. Here, mandating the repatriation of aliens whose entry was barred at the time they entered the United States on account of a Presidential Proclamation under § 1182(f) is a permissible Executive Branch exercise of inherent authority, that is also consistent with the broad parameters Congress utilized to implement the inherently sovereign function of regulating entry of aliens into the United States.

The Court nonetheless suggested that Executive authority in this context is at its "lowest ebb" because the Proclamation is "incompatible with the expressed or implied will of Congress." Doc. 37 at 13 (quoting *Youngstown Sheet*, 343 U.S. at 638 (Jackson, J. concurring)). This is incorrect; a Presidential Proclamation issued pursuant to his constitutional authority over national security and foreign affairs, coupled with an express delegation of authority from Congress to suspend or restrict entry, is a quintessential exercise of the President's power at its peak. *Id.* at 635–37; *see also Hawaii*, 585 U.S. at 712 (Thomas, J., concurring) (noting "Section 1182(f) does not set forth any judicially enforceable limits that constrain the President ... [n]or could it, since the President has *inherent* authority to exclude aliens from the country."). In circumstances such as those presented by this case, where the President "acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635 (Jackson, J. concurring).

*Second*, the Proclamation permissibly restricts the ability to seek asylum through credible fear procedures. The Proclamation permissibly bars physical entry for all aliens covered by its provisions, a proposition Petitioner does not contest. Likewise, for reasons

- 29 -

already noted, the Proclamation permissibly extends to the repatriation of aliens who, although covered by the Proclamation and thus barred from entering, manage to effectuate a physical entry in violation of the law. Part and parcel with these provisions is the Proclamation's limitation on consideration for asylum, a discretionary form of relief under the INA. That limitation on relief and protection follows directly from the plain language of the statute, which extends to—and, accordingly, bars—entry of aliens who intend to seek asylum, and is supported by the common-sense proposition that the government need not engage in futile consideration of an application for relief or protection that cannot result in an actual grant of relief or entry into the United States.

As an initial matter, the language of § 1182(f) naturally extends to pretermission of asylum eligibility during a period where a suspension of entry is in effect. That provision allows the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants," specified classes that include asylees. *See* 8 U.S.C. § 1101(a)(15) ("The term 'immigrant' means *every alien* except an alien who is within one of the following classes of nonimmigrant aliens") (emphasis added). The Supreme Court has recognized that broad deference is due even to "the President's chosen method of preventing" an influx of illegal immigrants into the United States, holding that the relative "risk of harm" associated with repatriating an alien under § 1182(f) is "irrelevant to the scope of [the President's] authority to take action" that the statute does not "clearly prohibit[]." *Sale*, 509 U.S. at 187–88. As discussed above, the President's extensive powers to suspend entry would be severely undermined if he "could not take any action" or impose certain restrictions to discourage aliens from simply "disregard[ing] the prohibition" and illegally entering the United States to pursue (and potentially qualify for) benefits even after having flouted the law. *See Huisha-Huisha*, 27 F.4th at 729. Allowing aliens who are covered by a Proclamation to seek asylum and thereby be admitted to the United States would run contrary to § 1182(f)'s allowance for a total suspension of entry.

Moreover, asylum is a discretionary form of relief that is permissibly precluded by

the suspension authority of § 1182(f). *See* 8 U.S.C. § 1158(a)(1)(A). As the D.C. Circuit opined in considering a claim that the COVID expulsion order pursuant to 42 U.S.C. § 265 could not override the asylum statute:

> The best reconciliation of the two statutes is based on the discretionary nature of asylum. The Executive "may grant asylum." Or it may not. It is a matter of executive "discretion." And here, for public-health reasons, the Executive has shown an intent to exercise his "discretion" by foreclosing asylum for the specific subset of border crossers covered by its § 265 Order. It's true that the § 265 Order forecloses more than just a grant of asylum; it also forecloses the statutorily mandated procedures that aliens use to apply for asylum. But if the asylum decision has already been made – by the § 265 Order – then those procedures would be futile.

*Huisha-Huisha*, 27 F.4th at 730–31.

This same rationale controls in the context of Section 1182(f). To the extent that the Proclamation extends to intending asylum seekers, the Executive has exercised its discretion to foreclose relief to that class of aliens. And although the Proclamation additionally "forecloses the statutorily mandated procedures that aliens use to apply for asylum," *id.* at 731, there can be no harm in that foreclosure where the end result is preordained: the Proclamation bars entry, including of those who intend to seek asylum, and thus no favorable decision on an application is possible.

By permitting the President to suspend the entry of all or any discrete class of aliens, which includes intending asylum seekers under the plain language of the statute, Congress did contemplate a suspension of entry extending to such aliens. Having enacted a provision that contemplates barring entry to aliens who intend to seek asylum, Petitioner's assertion that the government must provide those aliens with the statutory and regulatory procedures for assessing asylum in the expedited removal context lacks merit. The asylum statute provides a general rule that aliens who arrive in the United States may apply for asylum, while § 1182(f) provides a specific condition applicable depending on the terms of any Proclamation issued under that authority. Again, Congress clearly contemplated asylees

and refugees falling within the scope of the language used in § 1182(f), and thus it is that section that provides a very narrow, specific exception to the more general availability of asylum and related protection for aliens who arrive in the United States. Indeed, "'it is a commonplace of statutory construction that the specific governs the general.' *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). "The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S 639, 645 (2012).

The Court previously suggested that, because inadmissible aliens are generally permitted to apply for asylum once they are present in the United States whether or not they have legally entered the country, § 1182(f) cannot restrict their ability to apply for asylum under § 1225(b). Doc. 37 at 12; *see also* Mot. ¶ 16. Yet Congress permitted the President to suspend the entry of all or any discrete class of aliens, which includes aliens who intend to seek asylum. Congress thus did contemplate a suspension of entry that extended to such aliens. By suspending their entry, that necessarily pretermits their ability to apply for asylum. If intending asylum seekers violate that suspension on entry by crossing the border, their entry is still suspended by the Proclamation and not entitled to asylum-screening procedures. That is, because § 1182(f) suspends entry, it need not specifically mention asylum to preclude access to those asylum procedures. *See* Doc. 32 at 12. Relatedly, because Congress authorized this suspension on entry, the Proclamation does not override or conflict with the asylum statute. *See id.* at 11–12; Mot. ¶¶ 16–17.[6]

### iii. Plaintiff's APA Challenge Cannot Succeed.

With respect to her APA claim in Count III, as explained, the Presidential Proclamation is not reviewable under the APA. *See supra* § II(A)(i). And Petitioner has

---

[6] Although not all prior uses of § 1182(f) have limited access to asylum, there is no textual reason to so confine its use.

not identified any final agency action for challenge—other than the actions taken in her individual case. *See* 5 U.S.C. § 704 (requiring final agency action). The Supreme Court has held that courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability ... designed to implement' that decision." *Texas v. Biden*, 597 U.S. 785, 809 (2022) (quoting 5 U.S.C. § 551(4)). Here, the Proclamation—and its directive to the Secretary, the Attorney General and the Department of State to act—is the only legally relevant document to Petitioner's claims, but it cannot form the basis for an APA challenge.

The APA also does not permit review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). A Proclamation under §§ 1182(f) and 1185(a)(1) is just such a discretionary action, because these statutory provisions provide broad discretionary authority to the President to suspend by proclamation the entry of any class of aliens whenever he finds their entry would be detrimental to the United States. *See supra* § II(A)(i), (ii). Indeed, "[b]y its terms, § 1182(f) exudes deference to the President." *Hawaii*, 585 U.S. at 684; *see also Webster v. Doe*, 486 U.S. 592, 600 (1998) (holding that similar statutory language that "exudes deference" to the Executive cannot be reviewed under the APA because it "foreclose[s] the application of any meaningful judicial standard of review"); *Sale*, 509 U.S. at 187 (discussing broad authority under § 1182(f)); *Abourezk*, 785 F.2d at 1049, n.2 (describing the President's "sweeping proclamation power").

But even assuming Petitioner's APA claim could overcome these threshold hurdles, it still is unlikely to succeed for the same reasons her mandamus claims in Counts I and II cannot succeed. Because the Proclamation suspends Petitioner's entry and lawfully restricts her access to the asylum process to enforce that suspension on entry, the government did not violate the law by failing to provide a credible fear interview with an assessment for asylum and, if negative, IJ review.

### iv.    *Petitioner Cannot Succeed on Her Due Process Claim.*

Petitioner also appears to rely on her due process claims in Count IV as a basis for

injunctive relief. Mot. at pp. 1, 13 (citing "due process"). As the Court has already noted, such claims are not likely to succeed because an alien seeking initial admission to the United States has no constitutional rights without respect to her application for admission or request for asylum. *See* Doc. 37 at 17 n. 9 (citing *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1148 (9th Cir. 2022)). An alien seeking admission to the United States through asylum "requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *see also Thuraissigiam*, 591 U.S. at 139. The Supreme Court in *Thuraissigiam* confirmed that "an alien who tries to enter the country illegally is treated as an 'applicant for admission,' [under] § 1225(a)(1), *id.* at 139, and any rights that such aliens "may have in regard to removal or admission are purely statutory in nature and are not derived from, or protected by, the Constitution's Due Process Clause." *Mendoza-Linares*, 51 F.4th at 1167.

### B. An Injunction is Not Warranted Because the Proclamation's Enforcement is Necessary to Mitigate Severe Harms to the Public from Illegal Immigration.

Even if a nationwide or district-wide injunction were a legally available remedy, Petitioner has not shown that such broad relief is warranted here, because the balance of the equities weighs heavily against it. In January 2025, given the extreme, sustained surge of illegal migration across the southern border—straining DHS's ability to deliver swift immigration consequences, which in turn fueled further migration, Ex. 13 at ¶¶ 9–14—the President deemed it necessary to suspend the entry of those aliens who seek to cross the border illegally and without any screening for public safety or national security risks. *Id.*; 90 Fed. Reg. 8333. Since its inception, the Proclamation has served as a key tool to reduce southern border encounters, assist in restoring operational control over the border, and prevent the entry or release into the interior of aliens who present risks to national security, public safety, or public health. The public interest would be greatly disserved if Respondents were enjoined from implementing the Proclamation.

Over the past four years, at least 8 million illegal aliens have been encountered along the southern border of the United States, and countless millions more evaded detection after entering the United States illegally. Ex. 13 at ¶¶ 2, 7; 90 Fed. Reg. 8333. This migration has placed substantial costs and burdens on border communities and strained DHS resources. The sheer numbers of aliens crossing the southern border and the increase in the number of such aliens claiming fear meant that DHS could not make full use of expedited removal. Ex. 13 at ¶¶ 9–13. DHS further could not adequately screen for public health concerns. *Id.* ¶ 16. And there were increased encounters with aliens who pose threats to national security and public safety, although it is very difficult to verify with certainty the criminal record or national-security risks associated with those who enter across the border due to significant information gaps and processing times. *Id.* ¶¶ 17, 19. The enormous number of aliens crossing the border also opens up law enforcement gaps of which terrorist and criminal organizations are able to take advantage. *Id.* ¶¶ 20–21.

The Proclamation is critical to addressing these concerns, which prior efforts have proven unsuccessful at addressing adequately. *Id.* ¶¶ 2-49. After the Proclamation's implementation, southwest-border encounters between POEs decreased by almost half, releases from U.S. Border Patrol custody plunged by 80%, and there were substantial indicators of decreased drug trafficking activity. *Id.* ¶¶ 36-37, 40. If the government was enjoined from implementing the Proclamation, this would risk a loss of operational control over the southern border. And DHS's experience with similar past injunctions indicates that an injunction of the Proclamation would incentivize aliens to unlawfully enter the United States, leading again to large-scale releases of aliens who may present public-safety or health risks into communities nationwide, and the weakening of the government's defenses against transnational criminal organizations (TCOs). *Id.* ¶¶ 39–48. These TCOs—and, in particular, Mexico-based TCOs—endanger the health and safety of millions of Americans through drug trafficking, and engage in other illegal activities, including weapons trafficking and human trafficking, that challenge U.S. national security. Ex. 14 at

- 35 -

¶¶ 5–12. Large flows of illegal migrants across borders likewise make screening and vetting of foreign nationals more difficult, even as foreign nationals with potential terrorist connections continue to attempt to enter the United States. *Id.* ¶¶ 12–20.

Thus, Petitioner's contention (at ¶ 29) that the government would "not suffer harm" from an injunction of the Proclamation, Mot. ¶ 29, is plainly incorrect—and indeed blinks reality. Moreover, even assuming the public has an interest in preventing removal of aliens who have no lawful right to enter the United States, *see id.* at pp. 7-8, it is the broken asylum and expedited removal system that has exacerbated the surge in migration levels and contributed to the need for the Proclamation's suspension on entry. Absent the Proclamation, the sheer number of people seeking to enter illegally made it nearly impossible to expeditiously assess the large number of aliens with no valid claim for such protection; instead, such aliens have been often placed in removal proceedings and remain in the country for years, further incentivizing aliens without meritorious claims to take advantage of the system.

The requested injunction is also contrary to the public interest because it impinges upon the President's application of an important Act of Congress, 8 U.S.C. § 1182(f), that gives him the authority and flexibility to adopt restrictions on entry beyond the existing statutory grounds whenever he identifies a detriment to the national interest that Congress has not sufficiently addressed in existing provisions. *See Doe #1 v. Trump*, 944 F.3d 1222, 1228 (9th Cir. 2019) (Bress, J., dissenting); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (noting that "any time a State is enjoined from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

The injunction would also undermine the President's authority at the core of his power under Article II to protect the United States from harms from abroad. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-35 (2010) (stating that the Executive Branch's protection of these interests, including "sensitive and weighty interests of national security

and foreign affairs," warrants the utmost deference.); *cf. Hawaii*, 585 U.S. at 704 (noting that "'[a]ny rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,'" and thus a court's "inquiry into matters of entry" is "highly constrained" (quoting *Mathews*, 426 U.S. at 81-82)). The President's legitimate interest in regulating entry to protect the country from harms from abroad weighs in favor of denying injunctive relief.

In contrast to these substantial, significant harms, Petitioner Tabatabaeifar cannot show that she will suffer any harm absent an injunction—let alone irreparable harm. She has already received complete relief and will neither benefit nor be harmed by whether the requested nationwide injunction issues—which again serves as a powerful reminder that she lacks Article III standing to seek it. Ultimately, she is a complete and utter bystander to the relief now sought, rendering the prospect that she is "likely" to suffer irreparable harm absent its issuance utterly fantastical. *But see Winter*, 555 U.S. at 22 (plaintiff must show that irreparably injury is "likely" in the absence of an injunction).

Moreover, if she were ultimately ordered removed in administrative proceedings, her claims are subject to judicial review as provided by Congress: on a petition for review of her removal order, not on a mandamus petition or APA action. *See* 8 U.S.C. § 1252(a)(1), (a)(5), (b)(9). And if she prevailed in such proceedings, she could ultimately return to the United States—again defeating any irreparable harm here. *Nken v. Holder*, 556 U.S. 418, 438 (2009) ("[T]he burden of removal alone cannot constitute the requisite irreparable injury").

The claimed harms of others subject to the Proclamation likewise do not outweigh the harms to the public if the Proclamation is enjoined. Moreover, as explained *supra*, the claim that the repatriation of aliens subject to the Proclamation would violate any statutory rights is an inaccurate reading of the INA. Congress expressly provided the President authority to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants," 8 U.S.C. § 1182(f), and "class[es] of aliens" can include the group of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

aliens seeking asylum or withholding of removal, 8 U.S.C. § 1101(a). The statute vests no rights in aliens to avoid the effect of a Section 1182(f) suspension based on the contours of their "class." Further, aliens subject to the Proclamation are being assessed for and are still potentially eligible for protection from removal based on CAT, which precludes the removal of aliens to places where they will likely be tortured. *Id.* § 1231 note; 8 C.F.R. § 208.16(c); 28 C.F.R. § 200.1.

In sum, the balance of hardships thus strongly favors denying injunctive relief, and Petitioner has not established a likelihood of irreparable harm in the absence of the requested injunction.

**C.  There is No Basis to Order Return of Removed Individuals.**

Petitioner's request that the Court order the return of aliens "who were removed from the United States pursuant to the proclamation without being afforded proper asylum hearings," Mot. at pp. 1, 16, is independently improper.

As an initial matter, Petitioner's request is extremely overbroad even on its own terms, as it is not limited to those aliens who expressed an intent to apply for asylum. Nor does it bear even the slightest connection to Petitioner's *own asserted harms*. Such relief is beyond what Article III permits.

Regardless, Petitioner's motion does not identify any basis for an affirmative injunction requiring the government to "return" aliens who were repatriated after illegally crossing the border. It is Petitioner's burden to identify an affirmative source of authority permitting this Court to order their requested relief, and she does not identify any statute providing that authority. In order to compel an agency to take a specific action—whether under the APA, 5 U.S.C. § 706(1), or under traditional equitable principles—a court must first conclude that "an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Under traditional mandamus principles that have been carried forward into the APA, such an affirmative injunction remedy is "normally limited to enforcement of a specific, unequivocal

command"—that is, "the ordering of a precise, definite act about which an official has no discretion whatever." *Id.* at 53 (quotation and alterations omitted). Plaintiff merely cites "due process," Mot. at p. 13, but, as discussed, aliens seeking initial admission have no constitutional rights without respect to their application for admission or request for asylum. *See supra* § II(A)(iv).

And there has been no finding that these aliens were wrongfully removed apart from the challenged procedures, or that they are entitled to enter the United States. Their circumstances are categorically different than the cases they cite in support of their argument that this Court has authority to order return, which address aliens who were residing in the United States and were removed pursuant to different processes. *See D.V.D. v. DHS*, -- F. Supp. 3d --, 2025 WL 1142968, at *4 (D. Mass. April 28, 2025) (addressing removal of plaintiff O.C.G. to third country that was not designated as a country of removal on the alien's removal order)[7]; *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 1577811, at *31 (D.D.C. June 4, 2025) (ordering the government to facilitate pursuit of habeas relief for those removed without sufficient notice under the Alien Enemies Act; declining to order "return"). Whatever merit such arguments might have in those circumstances, they do not apply here where there was no bar to the aliens' removal at the time they were removed.

Additionally, to require the return of removed individuals who had no pre-existing right to enter the United States would effectively circumvent the Proclamation's suspension on entry. And it would be improper to enter such sweeping equitable relief to unnamed non-parties who may not even seek such relief, particularly without an individualized balancing of the equities and examination of each individual's claim to entitlement to return. *See, e.g.*, *D-V-D*, 2025 WL 1142968 at *25 (declining to order return until after discovery into the details of the individual plaintiff's case).

---

[7] Contrary to Petitioner's assertions, there is no indication in the cited *D.V.D.* decision that the plaintiff at issue, who had last entered the United States in May 2024, was subject to the Proclamation.

**D. The Court Should Issue a Bond and Stay the Injunction Pending Review.**

If this Court issues any injunctive relief, however, it should impose a bond requirement. *See* Fed. R. Civ. P. 65(c). The government also respectfully requests a stay pending appeal or, at minimum, a 14-day delay of the effective date of any injunction to provide time for the government to address the significant operational shifts that would need to occur in order to cease implementing the Proclamation and to allow time to seek a stay from the Ninth Circuit Court of Appeals.

The operational difficulties of abruptly changing procedures at the border overnight are considerable. They are not even conceivably justified to remedy any harms to Petitioner—who, again, has already received complete relief (and does not argue otherwise). In contrast, ordering immediate nationwide or statewide relief would inflict wanton and unjustifiable harms on the Government and would constitute a grave abuse of discretion.

**III.  The Court Should Not Combine the Instant Preliminary Injunction Motion With a Hearing on the Merits.**

Because Petitioner's claims are moot, the proper course is dismissal of the action. Accordingly, it is not appropriate to consolidate a hearing on the preliminary injunction with a trial or consideration of the merits. *See* Doc. 42 (asking the parties to address "[w]hether it is appropriate to combine a hearing on the merits with the preliminary injunction that has already been entered in this case"). But even if dismissal were not appropriate, the government objects to consolidating the preliminary injunction with a hearing on the merits given the expedited briefing schedule issued by this Court. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 801 (9th Cir. 2019) ("[A] district court may consolidate a preliminary injunction hearing with a trial on the merits, but only when it provides the parties with clear and unambiguous notice [of the intended consolidation] either before the hearing commences or at a time which will afford the parties a full opportunity to present their respective cases.").

## **CONCLUSION**

Petitioner's request for a nationwide injunction should be denied for lack of jurisdiction—at least three times over—and this action dismissed. If this Court grants any relief, it should stay such relief pending appeal or, at a minimum, delay its effective date for 14 days.

Respectfully submitted on June 19, 2025.

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

BRIAN C. WARD
*Acting Assistant Director*

/s/ *Katherine J. Shinners*
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

*Counsel for Respondents*

- 41 -